ROBERT L. BARRY V. STATE

No. 28,588. January 9, 1957.
Appellant's Motion for Rehearing Overruled
March 6, 1957.
Appellant's Second Motion for Rehearing Overruled
(Without Written Opinion) April 10, 1957
Petition for Writ of Certiorari Denied by Supreme Court of
United States, October 14, 1957 — Filed October 21, 1957.

Anderson and *Latham,* Wichita Falls, for appellant.

*Leon Douglas,* State's Attorney, Austin, for the state.

MORRISON, Presiding Judge.

The offense is rape; the punishment, 50 years.

Prosecutrix, an eleven-year-old sixth grade student, testified that on September 1 she went on her bicycle to the appellant's home to see his step-daughter about going skating, knocked on the door, and asked if Glenda was there. The appellant answered that she was and invited her inside. As she entered the door, the appellant stepped from behind the door clad in his shorts, placed his hand over her mouth, scratching her face as he did so, pulled her into the bedroom, and pushed her down on the bed, where he ravished her, stating, "I have done this to Glenda." She stated that, while the act was in progress, the appellant pushed

a piece of sheet into her mouth and told her that he would choke her if she screamed and, after he let her up, he offered her money and again threatened to kill her if she told anyone. She testified that she went immediately home and reported to her mother what had happened, that her mother gave her a douche and called the sheriff.

Prosecutrix' mother testified that, as her daughter returned home, she heard her crying and in a hysterical condition; she reported to her that the appellant had assaulted her, and, in cleaning up the private parts of the prosecutrix, she found blood. She stated that she carried the prosecutrix to Dr. Smith for an examination.

With this testimony, the state rested.

The appellant called Dr. Smith, who testified that he examined the prosecutrix on the day in question and found a bruised place on her cheek, found the child to be well developed for her years, found no tears in her vaginal walls or evidence of bleeding, but found live male spermatozoa within her vagina. He stated that the sperm which he found could have been deposited at any time within a 24-hour period prior to his examination.

Dr. Smith testified that sometime later the attorneys for the appellant requested him to examine the appellant for "spermatoza" and that he referred them to Dr. Taylor, a specialist.

He stated, in answer to a hypothetical question, that it would not be impossible, but would be highly improbable, that a man, who was incapable of ejecting live spermatozoa on a day subsequent to the day charged in the indictment and who at one time had been married to but begat no children by a wife who bore children to the husband preceding the man in question and the husband following him, and the same man who had later been married to a widow with children but begat no children by her, would be capable of ejecting live spermatozoa on the day charged in the indictment. He explained his answer by saying that occasionally when a vasectomy (an operation designed to prevent the ejaculation of sperm) is performed, the surgeon cuts or ties off only one tube. He stated further, "I know of several children that have been born that I feel sure were the result of the doctor thinking that he had cut both vas' and he did*n't the*re was an extra *v*hannel that the spermatozoa could travel through into the seminal vessels and be ejaculated."

Dr. Taylor, a urologist, stated that the appellant and his attorney came to him on December 28 following the day charged in the indictment and had him examine an ejaculatory specimen from the appellant and that he found no spermatozoa therein.

Dr. Grice testified that some six years prior to the date charged in the indictment he had assisted in a vasectomy on the appellant and that, following this operation, he secured a specimen of the appellant's semen in order to check the success of the operation and found no spermatozoa. He stated further that during the trial he had examined the appellant's scrotum and found the scar made by his earlier operation and found no other scar.

He answered the hypothetical question propounded to Dr. Smith, with the additional facts which were known to him, by saying that it was scientifically impossible for the man in question to be capable of ejecting live spermatozoa.

The appellant's wife testified that she and the appellant had been married approximately two years and had exercised no birth control methods and that she had not become pregnant but that she had borne four children to her prior husband. She stated further that prior to his marriage to her the appellant had been married to another woman who had borne children to her first husband, no children to the appellant (who was her second husband), and had later borne children to her third husband.

She stated that she and two of her children were at home with the appellant at the time the prosecutrix claimed to have been raped. In this she was supported by the testimony of her 14-year-old son.

Several of the appellant's neighbors testified that they did not see the prosecutrix enter or leave the appellant's house on the morning in question.

We shall discuss the evidence more fully in connection with the bills of exception so ably presented by appellant's counsel in brief and argument.

The state, even though assisted by private prosecution, has not favored the court with a brief.

Bill of Exception No. 1 relates to the trial court excusing the venireman Broadnax, a colored man. There is no showing

in this record that the appellant is a member of the colored race, nor is it shown that appellant was prejudiced by the juror being excused.

In two recent cases, the question of alleged discrimination against women in jury selection has been before this court. In Rogers v. State, 163 Texas Cr. Rep. 260, 289 S.W. 2d 923, we pointed out that the accused belonged to a different sex from the excused jurors. In Winfield v. State, 163 Texas Cr. Rep. 445, 293 S.W. 2d 765 (cert. den. October 8, 1956, 77 Sup. Ct. 51), we referred to the recent opinion of this court in Alexander v. State, 160 Texas Cr. Rep. 460, 274 S.W. 2d 81 (cert. den., 75 Sup. Ct. 108), and the annotation which appears in 9 A.L.R. 2d 811. From these authorities, we concluded that the majority rule required the accused to be a member of the class against whom discrimination is alleged before he may be heard to complain. In the Winfield case, we said, "We conceive it our duty, unless very strong circumstances impel us to do otherwise, to hold with the great weight of authority."

Since the appellant has not shown himself to be a member of the colored race or shown any injury therefrom, he cannot be heard to complain that the venireman Broadnax, a colored man, was excused from jury service. Alexander v. State, supra.

Bills of Exception Nos. 4-10 relate to alleged undue restriction of the voir dire examination of the veniremen.

Accompanying the record is a transcript of the voir dire examination of the veniremen which has proven most helpful in appraising the bills.

Illustrative of the contentions advanced is the following: Venireman Morrison was propounded the following question by counsel for the appellant:

"All right sir. Now Mr. Morrison in a criminal case the defendant does not have to testify. He may if he desires or he may not if he desires, and that is usually left up to his lawyers to determine whether he will or he will not. Now the Court will charge you that if he decides not to testify or if we decide for him that we will not put him on the stand, the Court will tell you * * *"

The court sustained the objection of the state to "the statement to the jurors whether or not the defendant will take the

stand is usually decided by the attorney" and permitted the following question to be asked and answered:

"Q. Now Mr. Morrison, as I started saying to you whether the defendant takes the stand or not there is a question that will be decided here and if the Court instructs that if he does not take the stand—he will tell you that he does not have to take the stand if he doesn't desire to, but if he elects not to take the stand, he will instruct you that you will not consider that fact at all either as a circumstance of his guilt or innocence, you won't even discuss it. Now if that happens and the court instructs you that way why you will follow that law will you not? A. Yes, sir."

Venireman Pitts was propounded the following questions by counsel for the appellant:

"Q. Now then the Court will also charge you as a part of the law in this case that a person charged with crime may take the stand and testify in his own behalf if he so desires and he need not take the stand if he does not desire. Now at this time we don't know whether he will take the stand and testify or not but in the event that he does not take the stand and testify in his own behalf, would you hold that against him? A. No, I think not.

"Q. In other words you would follow the court's instructions on that would you not? A. Yes, sir."

but the court sustained an objection to this question:

"Mr. Pitts, after the State has put on their testimony and suppose that the defendant doesn't put on any testimony at all. Now suppose that there are some questions in your mind that you feel like he might clear up if he took the witness stand, there may not be you understand, but suppose that there are, and you are in doubt as to whether or not you should find him guilty or innocent. And so he doesn't take the witness stand himself and testify. Now with this doubt here you don't know, You have got some question in your own mind as to whether you should find him guilty or innocent. Would you use, if you were in that situation, would you use his failure to testify against him and find him guilty under those circumstances? * * *."

Appellant relies upon authorities such as Meador v. State,

94 Texas Cr. Rep. 608, 253 S.W. 297. In that case, the trial court refused to permit counsel for the accused to examine the veniremen to determine if they were prejudiced against the law of self defense based on real or apparent danger, which, quite naturally, resulted in a reversal of the conviction. But do we have such a case before us here? We think not.

The venireman Morrison had qualified as a juror and stated that he would follow the law and would not consider the failure of the accused to testify in his own behalf as evidence against him. The court declined to permit counsel to inform the venireman that the decision not to testify was usually made by the attorney for an accused. If this were true in appellant's case, there was no way he could prove it to the jury, and so we must construe the question as an effort to convey inadmissible evidence to the venireman before he was selected.

As to venireman Pitts, the second question impresses us as being repetitions and having once answered the same in an unequivocal manner the trial court had the right to prevent the propounding of the same question in slightly different language.

The court sustained an objection to the following question of venireman Wood:

"* * * * The Court will charge you that if he does not testify you will not consider that as any evidence of his guilt, you will not refer to it or mention it or allude to it in any manner. Now if after the testimony is closed, you are in a position to where you are not quite convinced that the man is guilty, and you are trying to make up your mind whether he is guilty or whether he is innocent, and he hasn't taken the stand say, now there may be some things in your mind that you think that if he took the stand he could clear them up; there may not be but there may be also. Now then his failure to take the stand and clear up these little matters, would you take that into consideration against him? Under those circumstances or any other circumstances?"

but did, in lieu thereof, propound this question to him:

"* * * * Mr. Wood the law says that it cannot be held against a man for any purpose. Whether he does or does not take the witness stand. You and I and everybody else has a right to sit silent. That is one of the basic laws that our whole form of government is based upon. Now in order to be a fair juror a person would have to feel in his own mind that he would not hold

it against the man all that anyone would be doing would be going by what the law provides for everybody. Now the question is, understanding that that is the law, would you go into that jury box with a fair and open mind and not consider the fact that the defendant does or does not testify, as far as determining his guilt or innocence? Because he can sit there when anybody might think that he ought to testify but does not have to and it shall not be held against him."

The appellant, after having exercised a peremptory challenge to Wood, for the purpose of his bill, got a favorable answer to the excluded question and now says that if he could have received such favorable answer prior to election he would have chosen Wood.

We have concluded that the court's question was sufficient and proper and that the appellant should not be allowed to propound questions of the venireman that would tend to commit him in detail to any course of reasoning in advance of his selection. Lassiter v. Bouche et al, 41 S.W. 2d 33 (writ refused).

By Bill of Exception No. 2, appellant complains that he was not permitted to ask the prosecutrix whether or not she had had sexual relations with a certain boy in the community.

Though the court gave the appellant ample opportunity of perfecting his bill of exception by completing the question and securing an answer thereto in the absence of the jury, he declined to do so by stating, "No sir, nothing if we can't get it before the jury we don't care to have it before the Court."

The bill recites that, regardless of what prosecutrix' answer to such question might have been, the answer would have had a bearing upon the weight the jury would have given her testimony. This is indeed a novel argument. This is a bill to the exclusion of evidence, and yet nowhere in the record does the excluded evidence appear. In the absence of such a showing, we are at a loss to know how we might appraise the bill.

Appellant's last argument is addressed to the sufficiency of the evidence to sustain the conviction. He takes as his premise the assumption that the jury was bound to accept the testimony of Dr. Grice that it was scientifically impossible for the appellant to have ejaculated spermatozoa. He overlooks the testimony of his other expert witness, Dr. Smith, who stated that it would not be impossible, but would only be highly improbable,

together with his further testimony. that he had known of several children who had been born after their fathers had undergone such an operation.

The testimony of the eleven-year old prosecutrix was a complete case of rape.

The jury was at liberty to believe any part of the testimony and reject the remainder. They saw the witnesses and passed upon their credibility, and we are not at liberty to disturb their verdict where the same is based upon probative evidence.

Finding no reversible error, the judgment of the trial court is affirmed.

DAVIDSON, Judge, dissenting.

Venireman Broadnax, a Negro, was duly drawn as a member of the venire from which the jury in this case was to be selected. He was, in all things, qualified under the Constitution and laws of this state for jury service. He was not shown to be disqualified to serve on the jury in this case.

Over appellant's objection and at the request of the state, the trial court dismissed Broadnax from the venire list and from jury service because he was a member of the Negro race and because of the absence of facilities to house and feed a jury composed of members of both the white and Negro races.

In Rogers v. State, 163 Texas Cr. Rep. 260, 289 S.W. 2d 923, and Winfield v. State, 163, Texas Cr. Rep. 445, 293 S.W. 2d 765, by dissenting opinions, I attempted to make it clear that, to my mind, the arbitrary refusal to call women for jury service or empanel women therefor after being called was violative of the Constitution and laws of this state and of due process under both State and Federal Constitutions. In those cases, women were discriminated against and denied the right of jury service because of their sex.

In the instant case, as has been stated, the juror was discriminated against and denied the right of jury service because he was a member of the Negro race.

If one member of the Negro race may be arbitrarily dismissed and disqualified for jury service because of his race,

it necessarily follows that all members of the Negro race may be so treated.

It is now the settled law of this state that one accused of crime has no right to demand that the jury before or by whom he is to be tried shall be drawn and selected, fairly, from a cross section of all those who are qualified under the law to serve as jurors, without reference to any particular race, sex, nationality, or membership in established groups or classes.

It has often been said that it is a poor rule that will not work both ways. Now if an accused cannot demand that the jury be selected from those qualified for jury service without reference to sex, race, or class—as my brethren hold—then, by that same rule, the accused would have the right to demand that he be tried before a jury selected only from those who come within the same sex, race, or class of which he is a member.

Thus is demonstrated, to my mind, the utter fallacy of the rule of law which my brethren have announced.

I cannot help wondering what my brethren would hold if a member of the Negro race were to insist that only members of the Negro race be drawn for jury service, or if a woman were to insist that she is entitled to be tried by a jury composed only of women, or a white male were to insist that only white male persons compose the jury before whom he is tried. I am at a loss to understand how my brethren, under their holding here, could fail to recognize such insistence.

If the accused can complain only that members of his race, sex, or class are denied jury service, then, in order that such right to complain be preserved, the jury must be selected from those groups and none other. Only in that manner would the accused be accorded his right to prevent unjust discrimination.

My brethren justify their position, and the situation in which they have placed themselves, by saying that the accused is denied equal protection of law, as guaranteed by State and Federal Constitutions, only when he is a member of the class against which the discrimination is practiced.

The complaint which the appellant is here registering and of which Rogers and Winfield complained was not that they, as members of a certain race, sex, class, or group, had been discriminated against in the drawing of the jury, but that they

were entitled to have a jury drawn from all those persons having the qualifications of jurors under the law, without reference to race, sex, nationality, groups, or classes to which the accuseds belong.

By Art. XVI, Sec. 19, of our State Constitution, the legislature is enjoined to "prescribe by law the qualifications of grand and petit jurors." The only limitation there placed upon that power of the legislation was that "neither the right nor the duty to serve on grand and petit juries shall be denied or abridged by reason of sex."

In view of that constitutional provision, I was—and am still—amazed at the holding of my brethren in the Rogers and Winfield cases, because women were there permitted to be discriminated against for jury service solely because of their sex.

To me, the fallacy of the holding here and in the Rogers and Winfield cases is thus demonstrated. My brethren have wholly misapplied the due protection clause of the Constitutions to the instant fact situation. It has no application here.

The race discrimination here practiced was not against the accused. The discrimination was against the juror. By that discrimination, appellant was denied his constitutional right of due process of law.

I respectfully dissent to the affirmance of this conviction.

## ON APPELLANT'S MOTION FOR REHEARING

WOODLEY, Judge.

Appellant complains that his bill of exception relating to the excusing of the juror Ed Broadnax should not have been disposed of solely on the question of whether there was racial discrimination and whether or not he was in position to complain of discrimination against jurors of the colored race.

The bill of exception will be reconsidered in the light of appellant's contention: "In this case the State did not exercise its challenge, and the Court's action in excusing the prospective juror without cause was in violation of the Articles above cited (Arts. 612 et seq. V.A.C.C.P.), and, in effect, gave the State sixteen peremptory challenges."

The bill of exception certifies that the prospective juror, Ed Broadnax, was examined and found to be qualified; that before exercising its right of challenge the state requested the court to excuse Broadnax ("he being a colored man"); that at the time Broadnax was examined the state had exercised 13 peremptory challenges and that the court excused Broadnax over appellant's objection.

The bill further certifies that at the time Broadnax was excused eleven jurors had been sworn and had he not been excused appellant, who had only one peremptory challenge left, would have accepted Broadnax.

The bill further shows that there were 46 remaining veniremen available.

The state was entitled to challenge 15 jurors without assigning any reason therefor. Arts. 614 and 615 V.A.C.C.P.

Thirteen such peremptory challenges had been used before Broadnax was excused at the state's request.

The appellant had no vested right to have Juror Broadnax, and the state had the statutory right to peremptorily excuse 15 veniremen. This is so because the state and an accused have a right to reject but never have a right to select any particular juror. McMurrin v. State, 156 Texas Cr. Rep. 434, 238 S.W. 2d 632 (cert. denied 72 Sup. Ct. 115; 342 U.S. 874; 96 L. Ed. 657) and Ross v. State, 157 Texas Cr. Rep. 371, 246 S.W. 2d 884 (cert. denied 72 Sup. Ct. 1067; 343 U.S. 969; 96 L. Ed. 1365).

There is nothing in the bill of exception or in the record to show that after Broadnax was excused the state used another peremptory challenge.

In the absence of a showing that the state used fifteen challenges in addition to having Broadnax excused in effect allowed the state to use sixteen peremptory challenges in violation of Art. 615 V.A.C.C.P.

Our attention is directed to that portion of Bill of Exception No. 11 wherein it reads: "That in the opinion of the witness, the operation in 1949 was a success, and that the defendant had been completely sterile ever since.

"That none of the foregoing testimony was controverted or

rebutted in the slightest degree; that it was a scientific impossibility that the defendant could have deposited live spermatazoa in the vagina of the prosecutrix as was found on examination by the witness Dr. Smith; that the verdict of the jury was based entirely upon bias and prejudice and was without support in the evidence."

We do not interpret this as a certification of the trial judge that the verdict was not supported by the evidence but was based upon bias and prejudice. On the other hand, it appears that the language quoted was a part of appellant's contention "that there was no evidence of probative value upon which the jury could base a conviction."

Appellant's motion for rehearing is overruled.