Matthew Donald JOHNSON and Marion Ernest McMillan, Appellants,

v.

The STATE of Texas, Appellee.

Nos. 43415 and 43416.

Court of Criminal Appeals of Texas.

April 14, 1971.

Rehearings Denied June 9, 1971.

Frank P. Hernandez, Vincent W. Perini, Dallas, for appellants.

Henry Wade, Dist. Atty., John B. Tolle, Harry J. Schulz, Jr., W. T. Westmoreland, Jr. and Edgar A. Mason, Asst. Dist. Attys., Dallas, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

MORRISON, Judge.

The offense is injuring property belonging to another, the extent of the injury being over fifty dollars; the punishment as to each appellant, ten (10) years.

The sufficiency of the evidence is challenged.

On July 1, 1968, at about 10:30 p. m., a group of 30 to 50 Negro people, many of them dressed in a manner somewhat different from the dress of the ordinary customer, entered the O.K. Super Market one at a time. Appellants McMillan and Johnson were the first of the group to enter the store. They went to all parts of the store while appellants walked to the back. At this point, the employees heard glass breaking in the area in which the appellants were standing.

Merchandise in the store was scattered, broken, mutilated, and commingled by the persons who had entered the store. Describing the scene, an employee stated:

"There was milk and eggs all mixed together with cereal and sugar, watermelons and mustard, just most anything you could imagine was busted and broken."

Five minutes after they entered the store, the group left. Appellants were the last to leave. A partial listing of the destroyed merchandise, which had a value in excess of fifty dollars, includes: 3 one-gallon jugs of milk, 2 five-pound bags of sugar, 2 one-quart containers of mustard, over seventeen pounds of tomatoes, several cartons of eggs, four boxes of detergent, many bottles of pickles, two quarts of cooking oil, many watermelons, and 12 one-pound packages of oleo. An employee saw appellant Johnson break two bottles of grape juice and drop a watermelon twice. He also saw appellant McMillan take a gallon bottle of milk out of the dairy container and drop it, breaking the container.

Later the same evening, after the store was cleaned up, appellants re-entered the store, bought some beer and McMillan commented, "These white people sho keep a nice clean store."

We find the evidence is sufficient to support the verdict.

■ Appellants first contend that the trial court erred in refusing to disqualify himself and in refusing to grant their motion for continuance of the hearing on disqualification. In the testimony before the court, appellants showed that the trial judge, the Honorable James B. Zimmermann, was running for re-election in a contested race at the time of this trial. They also showed that the case was originally set in Judge Zimmermann's court, Criminal District Court No. 3, later transferred to Criminal District Court, then retransferred to Criminal District No. 3. There is no showing that the judge was disqualified. Nothing is presented for review.

■ Appellants base their motion for continuance of the above described hearing on the absence of two witnesses, whose anticipated testimony they have failed to show. Therefore, nothing is presented for review. Belrose v. State, 156 Tex.Cr.R. 322, 242 S.W.2d 378; Massoletti v. State, 165 Tex.Cr.R. 120, 303 S.W.2d 412.

■ Appellants' second contention is that the trial judge erred in refusing to grant a continuance of the main trial. This motion was filed and heard on August 19, 1968, the day of the trial. The record shows that the indictments were filed on July 15, 1968. The principal basis for appellants' motion for continuance was that they needed until the next term of court to secure the attendance of two witnesses. There was no allegation or showing as to when these witnesses would be available.

Further, the motion for continuance stated that due to the fact that the applications to take depositions of some five witnesses were denied, the defendants needed more time to talk to and to locate these witnesses in order to prepare an adequate defense to the charges pending against them. There is an entire lack of showing of the diligence exercised by appellants in endeavoring to interview or locate such witnesses. No error is reflected. Rodele v. State, 158 Tex. Cr.R. 167, 254 S.W.2d 122 and Burrell v. State, Tex.Cr.App., 446 S.W.2d 323.

■ Appellants' third contention is that the trial court erred in refusing a change of

venue and that the trial judge favored the State in the venue hearing by admitting affidavits in lieu of witnesses. The testimony introduced by appellants at the venue hearing showed that appellants had been the subject of items on a news program of one of the major television stations in Dallas approximately four times in the preceding month; that a television newsman had read about them in the local newspapers eight to twelve times in recent months; that the appellants were newsworthy because they had opinions diverging from that of the majority of the public and because they had obtained an option to purchase a chain of grocery stores, one of which was the supermarket where the offense took place. Further testimony indicated that publicity, both in the newspapers and on television had shown that McMillan was a field secretary for the Student Non-Violent Coordinating Committee; that SNCC had a widespread reputation for being militant in black affairs; that there was publicity involving the incident at the supermarket out of which these charges arose; and that appellants' unusual manner of dress and hair style tended to cause a feeling of resentment among people in Dallas. Appellants also showed that they might be associated in the eyes of the public with destruction of property, interruption of business activities and conduct leading up to riots. All the defense witnesses testified that they were of the opinion that appellants could not receive a fair trial in Dallas County. However, they all testified that they could be fair and impartial jurors in Dallas County in spite of all the publicity with which they had come in contact.

In connection with the change of venue contention, it is well to observe that it was shown that Dallas County has a population of over one million persons. This is a far cry from what was before this Court in Rogers v. State, 155 Tex.Cr.R. 423, 236 S.W.2d 141, and Richardson v. State, 126 Tex.Cr.R. 223, 70 S.W.2d 1003, where the widespread publicity in a sparsely settled county required a change of venue. Further, this record shows efforts on the part

of the trial court to restrict pre-trial publicity.

Rubenstein v. State, Tex.Cr.App., 407 S.W.2d 793; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543; Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, and Coffman v. State, 62 Tex.Cr.R. 88, 136 S.W. 779, cited by appellants are readily distinguishable from the case at bar.

There is no showing in this record that there were inherently suspect outside influences affecting the community's climate of opinion as to defendants which would result in a probability of unfairness. This is the test in the Fifth Circuit, Pamplin v. Mason, 364 F.2d 1. The Court did not err in failing to grant the motion.

■ At the close of the evidence in the hearing on the motion for change of venue, the State introduced seven affidavits stating that the appellants' witnesses did not have sufficient knowledge on which to base their opinions that the appellants could not obtain a fair and impartial trial in Dallas County. Appellants objected to the introduction of these affidavits into evidence; the objection was overruled. Such affidavits controverted the source of knowledge of the appellants' witnesses, as is permitted by Art. 31.04, Vernon's Ann.C.C.P. No affidavits were offered by the appellants.

Appellants next contend that they were denied a fair and impartial trial and due process of law in the selection of the jury. Particularly, they contend that their challenge to the array of jurors, request for attachment of absent summoned jurors and motion to shuffle the jury panel were improperly overruled.

The following facts are urged in support of appellants' challenge to the array and request for attachment. The records show that 618 prospective jurors were summoned for jury duty on the week of the trial. 195 of those were qualified as members of the panel for that week. It also appears that

some 55 jurors were summoned but did not appear. Using 1960 census records, appellants showed that the total population of Dallas County was 811,261 White persons and 137,954 Black persons at the time of the census.

Appellants' figures show that out of the 618 prospective jurors who were summoned to serve, only 22 were from the predominantly Black South Dallas or West Dallas areas. Their calculations may also show that the percentage of White persons summoned and impaneled for jury duty was higher than the actual White-Black ratio of the total population for Dallas County, based on the 1960 census.

■ In regard to appellants' request for attachment of the absent summoned jurors, they alleged that they were denied an opportunity to be tried by a jury of their peers, as a result of the trial court's refusal to attach the absent summoned jurors. This allegation is based primarily on the fact that five of those prospective jurors resided within South Dallas and West Dallas.

At the time of the hearing regarding the jury selection, it was shown that this and all juries of Dallas County were drawn from the jury wheel in accordance with the law, and appellants were not able to show a single irregularity in the selection of the jury panel for the week. Mere showing that the jury panel does not exactly conform to racial percentages of the community does not establish systematic exclusion. Townsend v. Henderson, 6 Cir., 405 F.2d 324. Recently, the Fifth Circuit Court of Appeals had before them a contention similar to the one before us here. In United States v. Bigham, 421 F.2d 1344, the contention was that the jury list for the week of his trial, with one exception, was composed of residents of Duval County, Florida, and that such list contained no resident of the appellant's home county. There the court quoted from an earlier opinion by said court as follows: "There is no constitutional requirement of proportional representation of the components of the community. Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect proportionate strength of every identifiable group."

■ Appellants also requested the court to have the jury panel re-shuffled. They asked that the court shuffle the cards of the 195 jurors who appeared together with the 55 cards of the jurors who did not appear. The court ruled as follows:

"The Court will make available to you at this moment all of the cards that are down in the Central Jury Room. You may shuffle them any way you see fit. Now, the Court is not going to make available the cards of jurors who are sitting as jurors in other Courts and the Court is not going to make available to you the cards of the fifty-five people who were summoned who did not appear, because those people have not been sworn, they are not here, they have not been qualified."

Appellant's counsel answered, "We do not desire that type of shuffle."

It appears that the court offered to give appellants more than they were entitled to and no error is reflected.

■ Appellants next contend that "the unusual nature of the case required individual voir dire examination, and in light of the record the trial judge's refusal was error and a denial of due process." Appellants relied upon Streight v. State, 62 Tex.Cr.R. 453, 138 S.W. 742. In Streight, supra, which was reversed on other grounds, this Court held that in an extreme case it would be reversible error for the trial court, on motion, to refuse to exclude the veniremen from the courtroom during the selection of a jury. However, we refused to reverse on that ground. Appellants once again cite Estes v. Texas, supra, and Sheppard v. Maxwell, supra. All three of these cases involved much more pretrial publicity and prejudice than does the case at bar.

■ Appellants next contend that the trial court erred by not allowing defense counsel to ask prospective jurors certain questions on the voir dire examination. In the examination of one prospective juror, appellants' counsel asked the following question: "Do you allow your daughter to wear mini skirts?" The juror answered: "Yes, she wears—."

The court also refused to let the defense question a venirewoman, who was subsequently a juror, about her political affiliations, whether she was a Democrat or Republican. Appellants have failed to show this Court that the trial court abused his discretion in refusing to allow those questions and have failed to show how those questions were relevant to exercising their peremptory challenges.

Appellants were allowed to question one venireman, who subsequently became a juror, at some length about his understanding of the term "Black Power." Upon the State's objection, the court then instructed that the venireman be interviewed at the bench rather than have the entire jury panel hear the questions. Defense counsel then refused to ask any more questions regarding "Black Power" and, instead, he began to question the venireman regarding the range of punishment in the case.

Appellants' counsel later questioned another venireman, subsequently a juror, regarding his idea of what the term "Black Power" meant. The State objected and the court sustained the objection. Defense counsel, however, continued questioning regarding the juror's definition of the term "Black Power." Under the circumstances, we fail to see that the trial court abused his discretion.

Appellants contend that the trial court erred in denying certain applications to take depositions. Appellants do not discuss this point or show how they were harmed by the court's denial of their applications.

■ Appellants next complain that they were denied the grand jury testimony of G. L. Hill, who did not testify at the trial. Their brief states that the testimony was not made available to them until April 10, 1970, the time of approving the record. However, it appears from the record that three days before the trial began, the court made the following order in regard to all grand jury testimony:

"The Court will ask the State to produce it for the Court. The Court will keep it in its custody and at such time as the defense shows the Court that it has a need for it and a right to it, the Court will see to it that the defense is tendered the Grand Jury testimony."

Following this order, the voluminous record in this cause does not disclose another request for the grand jury testimony until after the trial. Appellants have failed to show that the trial court abused his discretion by failing to make the grand jury testimony available during the trial, particularly in light of the fact that Hill did not testify at the trial and that appellants have not shown that they attempted to talk to him, although they were given a list of all persons who testified before the grand jury.

■ Appellants next contend that the trial court overruled proper defense objections to questions asked by the state. The following is a typical excerpt from their brief:

"Leading question (R. 636, Vol. 2, Part 5)"

"Leading and suggestive (R. 637)"
This is followed by twelve similar statements. Such is not a proper ground of error under Art. 40.09, Sec. 9, V.A.C.C.P. McElroy v. State, Tex.Cr.App., 455 S.W.2d 223.

■ Appellants' complaint as to argument revolves around the use of the word "riot" by the prosecutor. This is how the matter arose. The prosecutor stated, "—they don't like the word 'riot' so we will have to use another word—," with ref-

erence to the incident in the case at bar. The court promptly sustained the objection and instructed the jury to disregard the use of the term. We have concluded that the court was excessively careful, because the conduct of these appellants and their confederates clearly would have come within the terms of Art. 455, V.A.P.C., which defines a riot.

█ Appellants interposed further objection to this portion of the prosecutor's argument: "They were there they knocked over things, they were in cahoots with the rest of those criminals out there." Clearly the acts of the appellants and all of those acting in unison with them constituted a violation of the law. Had their associates been apprehended and tried, they would have been criminals. This we deduce to be a logical conclusion from the evidence.

█ Another portion of the argument complained of reads as follows:

"Somebody sure as the devil bore the loss, but these two men should not be found guilty because O. K. Super Market was paid by an insurance company.

"How reasonable is that? It's like saying, ladies and gentlemen, if SNCC decides to come out and burn your house—."

The objection was sustained and the jury was instructed not to consider the remarks. From the record it is clear that the prosecutor was attempting to rebut the defensive claim as he understood it; that since the O. K. Super Market had not used every conceivable means of salvage, the appellants were less guilty. The reference to SNCC was clearly within the record; the owner of the super market testified that a group called SNCC contacted him after this incident and wanted to buy the store, and that appellant McMillan was one of the group.

█ Appellants next complain about the following portion of the State's argument:

"Now, I think perhaps, Mr. Perini's [defense counsel] closing remarks to the jury was that the Boston Tea Party was the beginning of a revolution. Perhaps it was. He made a very good analogy there. He is saying that perhaps they had a right to go in and dump that tea overboard. Perhaps, ladies and gentlemen, this is the beginning of a revolution which occurred out at the O. K. Super Market. He is saying that they have got the right to go in there and to do that and if he wants to revolt—."

At this point, appellant objected without stating a reason. The objection was overruled. The State's attorney continued by saying:

"He is saying that they have got a right to go in there and destroy O. K. Super Market and if they want to revolt—do we want a revolution in Dallas County, do we want to begin here?"

Objection was interposed and was overruled.

The prosecutor later argued: "* * * but let him identify what they are, they are revolutionists." Defense counsel's objection to this statement was also overruled.

This was indeed telling argument, but it was clearly invited by the following portion of the defense counsel's argument:

"What the whole story is about, what the whole context is is the ghetto gouger—the ghetto gouging grocery store. We are not talking about thieves and robbers and irresponsible people, we are talking about people here pursuing a purpose and think about that when you deliberate back there and consider this case.

" 'There is a dignity, a sublimity about the latest action of the second President of the United States and a signer of the Declaration of Independence.'

"John Adams wrote that in his diary. He is talking about an event which we now in retrospect realize was probably the most effective way to call attention to the English oppression in the American colonies. I am talking about the Boston Tea Party. I am talking about the willful destruction of property belonging to another without his consent, to-wit: thirty-five thousand pounds of English tea, perfectly good, dumped overboard by Paul Revere, John Hancock, Samuel Adams, sometimes known as the Father of the American Revolution. * * *

"Was there an evil intention in those American Patriots in so doing? Is there evil intention in a labor boycott, a labor dispute, is that evil intent? Are we talking about thieves and robbers? These men aren't thieves and robbers, they are felons, you heard the charge."

No error is shown. Valdez v. State, Tex.Cr.App., 462 S.W.2d 24.

 The indictment, omitting the formal parts, charged that the appellants,

"acting together * * * did then and there unlawfully, wilfully and mischievously, and without the consent of the owner thereof, Joe F. Elston *injure* certain property, to-wit, 3 gallons of milk *value of $1.18 each,* 10 gallons of ice cream *value of $.99 each* etc. * * * by then and there opening containers of said property, throwing scattering and intermingling the contents thereof *which said injury to said property was then and there of the value of over $50.00* and the said Matthew Donald Johnson and Marion Ernest McMillan, acting together did then and there wilfully and mischievously *injure and destroy* such property without the consent of the aforesaid owner thereof * * *." (emphasis added)

We find no merit in the appellants' contention that the indictment was duplicitous. In Steambarge v. State, Tex.Cr.App., 440 S.W.2d 68, cited by appellants, the allegation that the indictment was duplicitous referred to the fact that "in the same count the offense of an attempt to injure and destroy as well as the completed offense is alleged. * * *" See also Lacy v. State, Tex.Cr.App., 412 S.W.2d 911.

 Appellants also allege that the indictment "is fundamentally defective because it does not allege that the property was destroyed or the extent of the injury," as required by Jones v. State, Tex. Cr.App., 377 S.W.2d 205, and Barber v. State, Tex.Cr.App., 449 S.W.2d 53. Reference to the italicized portions of the indictment reveals that the indictment, although it is not a model indictment for this offense, does allege that the property was injured and destroyed and gives both the value of the property and the extent of the injury.

 Appellants next contend that the evidence is insufficient to show injury or destruction by the manner and means alleged. The indictment described the damage in these words, "by then and there opening containers of said property, throwing scattering and intermingling the contents thereof. * * *" Much of the evidence showed that the containers were broken. When a glass bottle is "broken," it is opened. We decline to undertake to count each separate item and set forth herein how it was destroyed or injured.

 Appellants' next two grounds of error relate to the court's charge. Each ground groups several different contentions and cites no authority. They do not set forth separately each ground as is required by Art. 40.09, Sec. 9, V.A.C.C.P. and, therefore, we decline to discuss these contentions.

 It is appellant McMillan's contention that he was entitled to a charge on former jeopardy. He bases this on the fact that he had a hearing by a justice of the peace on a peace bond. We find no merit in such contention.

■ Appellants next contend that the hearing on the motion for new trial was a nullity because the same was not held within the 20 days provided by statute, citing Steward v. State, Tex.Cr.App., 422 S.W.2d 733 and St. Jules v. State, Tex.Cr.App., 438 S.W.2d 568. Their motion for new trial was based on jury misconduct and had an affidavit of a juror attached thereto. Appellants reason that when the motion was overruled by operation of law, it was automatically reversible error.[1]

In this case, the court granted the State a continuance of the hearing in order to have more time to secure evidence that jury misconduct had not, in fact, occurred. At the hearing, the court considered testimony and affidavits from the remaining eleven jurors, who stated that such misconduct did not occur.

In the interest of justice, the action of the court was proper in order to show that the affidavit attached to appellants' motion for new trial did not reflect the true facts.

Finding no reversible error, the judgment is affirmed.

1. At the hearing on the motion for new trial, appellants refused to participate due to their contention that the hearing was a nullity.