Billy Joe BATTIE, Appellant,

v.

The STATE of Texas, Appellee.

No. 53166.

Court of Criminal Appeals of Texas.

June 1, 1977.

John A. Brady and Robert C. Roe, Jr., Fort Worth, for appellant.

Tim C. Curry, Dist. Atty., Marvin Collins, Joe Shannon, Jr., Howard A. Borg and Jack Strickland, Asst. Dist. Attys., Fort Worth, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

DAVIS, Commissioner.

Appeal is taken from a conviction for capital murder. Punishment was set at death.

The record reflects that on January 13, 1975, William Gray, manager of the In-N-Out Food Store in Fort Worth, finished his afternoon shift at 5:30 p.m. and left his niece, Peggy Hester, in charge of the store. At 7:30 p.m., Gray returned to the store and found all in order.

Appellant, in his written confession, which was admitted into evidence, stated that he, Artimus Mayfield, and Leon Turner entered the store in question that night. Appellant held a shotgun on Hester and a customer, later identified as John Howard Robinson. Turner got the money out of the cash register. Appellant then shot Hester and Robinson and the trio fled to Mayfield's house, where Mayfield hid the shotgun.

At 9:00 p.m., customers entered the store and, finding no attendant present, called the police. Upon investigation, the police discovered the bodies of Hester and Robinson in a back room. An autopsy revealed that Hester died from two shotgun wounds in the chest cavity and Robinson died from shock suffered from a shotgun wound in the abdomen. Two .410 gauge shotgun shell casings were found in the store, along with some shotgun pellets. Shotgun wadding was recovered from both bodies.

A .410 gauge shotgun, identified as the murder weapon, was recovered from Mayfield's home. It was determined that a total of $52.72 was taken from the store. The murder of Hester is the gravamen of this prosecution.

At the outset, appellant contends that the trial court erred in refusing to permit him to question prospective jurors concerning their understanding of the term "criminal

acts of violence" within the context of Art. 37.071(b)(2), V.A.C.C.P. Article 37.071(b), supra, reads as follows:

> "On conclusion of the presentation of the evidence [punishment stage of trial], the court shall submit the following issues to the jury:
>
> \*   \*   \*   \*   \*   \*
>
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society . .."

The complete voir dire of the jury is not before us; only the voir dire of the twelve jurors selected is included in the record. Complaint is raised by a bill of exception.

The bill of exception recites in pertinent part:

> "Specifically, the State would question a potential juror with respect to Art. 37.071(b)(2) C.C.P., by properly indicating that the Court would instruct the Jury in the language of Art. 37.071(b)(2) C.C.P., at the conclusion of the trial, involving the question as to whether there is a probability that the Defendant will commit future criminal acts of violence that would constitute a continuing threat to society.

> **III.**
> "When the prospective juror indicated to State's counsel that he or she understood such question or could follow such question, Defendant's counsel would, upon his voir dire of such prospective juror, ask what he or she understood 'criminal acts of violence' to mean within the context of the phrase concerned.

> **IV.**
> "More specifically, Defendant's counsel attempted to determine whether such potential jurors included 'personal property' as an object that could or would be, within their understanding of the phrase, something against which 'criminal acts of violence' could be directed.

> **V.**
> "The Court initially permitted Defendant's counsel, over objection by the State,

to question approximately three potential jurors with regard to their understanding of the phrase, 'criminal acts of violence,' as to whether such potential juror would include or exclude personal property within such person's understanding of the phrase concerned.

> **VI.**
> "Thereafter, during the second day of an eight day voir dire examination, the trial court advised Defendant's counsel that because of the extended time necessarily involved in questioning the potential jurors, the Court would sustain the State's objection and not permit Defendant's counsel to question any remaining potential jurors with regard to their understanding of 'criminal acts of violence,' to which ruling of the Court Defendant's counsel properly and timely excepted with respect to such remaining potential jurors, and thereafter in compliance with the Court's ruling, omitted propounding such or like questions during the remainder of the voir dire examination of the remaining potential jurors."

> **VII.**
> "At the time of such ruling by the Court in excess of two-thirds of the 71 prospective jurors that were eventually interrogated on voir dire, had not been questioned by either side and only one juror had been selected."

In *King v. State,* 550 S.W.2d 691 (1977), this Court, in an appeal from a conviction in a capital murder case, held that the trial court did not err in refusing the defendant's request to define in its charge words and phrases contained in Art. 37.071, supra: deliberately, probability, *criminal acts of violence,* continuing threat to society.

In rejecting appellant's contention, this Court first recognized that the words and phrases in issue had not been specially defined by the Legislature. Article 3.01, V.A.C.C.P., "Words and phrases," provides:

> "All words, phrases and terms used in this Code are to be taken and understood in their usual acceptation in common language, except where specially defined."

In *King*, it was recognized that this Court has rejected similar contentions relating to a trial court's failure to define "voluntarily" as contained in an indictment charging murder with malice, *Joubert v. State*, 136 Tex.Cr.R. 219, 124 S.W.2d 368; "burglarious entry," *Thomas v. State*, Tex.Cr.App., 543 S.W.2d 645; "sound memory and discretion," *Hogan v. State*, Tex.Cr.App., 496 S.W.2d 594; "reasonable doubt," *Whitson v. State*, Tex.Cr.App., 495 S.W.2d 944; "premeditated design," *Mitchell v. State*, Tex. Cr.App., 365 S.W.2d 804.

In addition, *King* noted that in *Powell v. State*, Tex.Cr.App., 538 S.W.2d 617, it was stated that the meaning of the term "an act of violence or threatened violence to a person or property" as used in V.T.C.A., Penal Code, Sec. 46.05, can be understood by a person of ordinary intelligence.

In *King*, it was noted that the rationale underlying the foregoing decisions was set forth in *Joubert v. State*, supra:

"Where terms used are words simple in themselves, and are used in their ordinary meaning, jurors are supposed to know such common meaning and terms and under such circumstances such common words are not necessarily to be defined in the charge to the jury."

We immediately recognize that our holding in *King* that the trial court need not define "criminal acts of violence" in its charge is not dispositive of appellant's contention since appellant's complaint is directed to the need of veniremen's answers to his questions in reaching an intelligent determination of when to use his peremptory challenges. Nonetheless, we do find guidance in the *King* decision in considering the instant problem.

■ While it has been held that great latitude should be allowed a party interrogating veniremen to enable his counsel to determine the desirability of exercising on the members thereof his right of peremptory challenge, *Kincaid v. State*, 103 Tex. Cr.R. 485, 281 S.W. 855; *Smith v. State*, Tex.Cr.App., 513 S.W.2d 823, it has also been recognized by this Court that the decision as to the propriety of any question is left to the discretion of the trial court and the only review will be for abuse of that discretion.

■ The Legislature of this State did not see fit to define "criminal acts of violence." Where the Legislature does not define words and phrases, Art. 3.01, supra, provides they are to be "taken and understood in their usual acceptation in common language." In *King*, this Court found that the term "criminal acts of violence" falls into that category of words "simple in themselves" and "jurors are supposed to know such common meaning and terms." It would be paradoxical for the Legislature and this Court to presume that members of a panel know the meaning of such terms as "reasonable doubt," "criminal acts of violence," "sound memory and discretion" and on the other hand for this Court to hold that a trial court has abused its discretion in not allowing a defendant to inquire of each member of the panel as to his or her understanding of such terms.

In determining whether the trial judge abused his discretion in disallowing counsel to inquire about each venireman's understanding of "criminal acts of violence" and whether "personal property" was an object that "could or would be, within their understanding of the phrase, something against which 'criminal acts of violence' could be directed," a consideration is the length of time expended in such examination. To be sure, expediency must always be a secondary consideration when weighed against the right of a defendant to a fair trial. Nonetheless, the trial judge must be vested with some discretion lest voir dire examination get completely out of control.

The bill of exception in the instant case reflects that the trial court initially permitted counsel for appellant to ask prospective jurors questions relative to their understanding of the phrase "criminal acts of violence," but that because of "the extended time necessarily involved in questioning the potential jurors," the court sustained the State's objection and did not permit "Defendant's counsel to question any re-

maining potential jurors with regard to their understanding of 'criminal acts of violence.' "

In *Smith v. State*, supra, we said:

"While appellant certainly has the right to examine the jurors to the end of forming his own conclusion, *Mathis v. State*, 167 Tex.Cr.R. 627, 322 S.W.2d 629 (1959); *Olliff v. State*, 161 Tex.Cr.R. 336, 276 S.W.2d 839 (1954); *Carlis v. State*, 121 Tex.Cr.R. 290, 51 S.W.2d 729 (1932); *Pendergrass v. State*, 121 Tex.Cr.R. 213, 48 S.W.2d 997 (1932); there is also no doubt that reasonable controls may be exercised by the trial judge to limit the questioning for various reasons. *Dworaczyk v. State*, 172 Tex.Cr.R. 142, 354 S.W.2d 937 (1962); *Broussard v. State*, 166 Tex.Cr.R. 224, 312 S.W.2d 664 (1958); *Barry v. State*, 165 Tex.Cr.R. 204, 305 S.W.2d 580 (1957); *Kincaid v. State*, 103 Tex.Cr.R. 485, 281 S.W. 855 (1926); *Johnson v. State*, 467 S.W.2d 247 (Tex.Cr.App.1971); *McCarter v. State*, 478 S.W.2d 524 (Tex.Cr.App. 1972); *Lewis v. State*, 488 S.W.2d 740 (Tex.Cr.App.1973). Voir dire examination can become the lengthiest part of the proceeding . . . . To curb some prolixity, it is recognized that courts need have a discretionary area within which the examination might be reasonably limited."

It takes no stretch of the imagination to recognize that voir dire examination could be endless if counsel were allowed to ask each prospective juror questions relative to his understanding of such words and terms as "reasonable doubt," "criminal acts of violence," and "sound memory and discretion" which have been found to be "words simple in themselves" that "jurors are supposed to know such common meaning."

We conclude that the trial court did not abuse its discretion in denying appellant's request to ask prospective jurors questions about their understanding of the term "criminal acts of violence."

Appellant next contends that the trial court erred in not granting his motion for mistrial based upon the trial court's failure to comply with the requirements of V.T. C.A. Penal Code, Sec. 12.31(b).

The applicable portion of Sec. 12.31(b), supra, reads as follows:

"Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

The record reflects that the trial court informed the veniremen that appellant had been charged with capital murder and that a sentence of life imprisonment or death was mandatory upon conviction of a capital felony. The trial court further propounded to the panel of prospective jurors the questions required by Art. 35.17, V.A.C.C.P., concerning the basic law and principles to be applied.

After the eleventh juror was selected, and prior to the selection of the twelfth juror, appellant filed a motion for mistrial complaining that the veniremen had not been qualified under Sec. 12.31(b), supra. The trial court overruled the motion, but stated that it would later swear the jury as to Sec. 12.31(b), supra. No objection was made by appellant as to the court's suggestion and no objection was made when the trial court subsequently administered the oath to the jury, including the provision in question from Sec. 12.31(b), supra.

The transcription of the court reporter's notes does not reveal that prior to the administration of the oath to the jury any of the veniremen were asked to state specifically whether "the mandatory penalty of death or imprisonment for life would affect their deliberations on any issue of fact."

Appellant contends that the dictates of Sec. 12.31(b), supra, constitute a mandatory oath that must be administered to each prospective juror. In *Smith v. State*, Tex. Cr.App., 540 S.W.2d 693, in interpreting Art. 1257(d), V.A.P.C., now Sec. 12.31(b), supra, we stated the following:

"Appellant seems to be laboring under the impression that Article 1257(d), supra, in itself constitutes an oath to be administered in its own terms to each venireperson. Our interpretation of this statute is that it merely provides one criteria by which each venireperson is to be qualified."

In *Boulware v. State*, 542 S.W.2d 677, we held that a defendant may waive his constitutional rights to have the trial jury selected under the standards of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, by failing to properly object.

In the instant case, the record reflects that each juror was approved by appellant and that no objection was raised by appellant concerning the failure of the jurors to be qualified under Sec. 12.31(b), supra. Appellant presented his motion for mistrial after the eleventh juror was selected but did not object when the twelfth juror was selected without being qualified under Sec. 12.31(b), supra. Appellant does not contend that he was limited in any way in his inquiry into the qualifications of any juror for this reason, nor does he complain of the impaneling or dismissal of any venireman. All jurors who served in the trial of this cause were administered an oath which contained the requirements of Sec. 12.31(b), supra.

While the court should have qualified each venireman under Sec. 12.31(b), we perceive no reversible error under the circumstances here presented.

Appellant further contends that the trial court erred in administering the required statutory oath set forth in Art. 35.22, V.A.C.C.P. to the jury by arbitrarily enlarging the same.

The record reflects that the trial court administered the following oath to the jury:

"In cause number 3654A entitled The State of Texas versus Billy Joe Battie, do you and each of you solemnly swear that you will a true verdict render according to the law and to the evidence and do you further solemnly swear that the mandatory penalty of death or imprisonment for life will not affect your deliberations on any issue of fact so help you God?" All the jurors answered in unison, "I do."

Article 35.22, V.A.C.C.P., states that the following oath shall be administered once a juror has been selected:

"You and each of you do solemnly swear that in the case of the State of Texas against a defendant, you will a true verdict render according to the law and the evidence, so help you God."

Appellant cites no cases in which the oath was expanded and our investigation reveals none.

In *Crisp v. State*, 87 Tex.Cr.R. 137, 220 S.W. 1104, the phrase "so help me God" was omitted from the oath administered to the jury. Such omission was held to be fatal because the quoted words were a material part of the prescribed oath. In *Arthur v. State*, 3 Tex. 403, and *Smith v. State*, 1 Tex.App. 408, the trial court did not follow the language of the statutory oath and administered a completely different oath.

■ In the instant case, *no words were omitted* from the oath required to be administered, nor did the addition thereto vary the meaning in any manner because the oath complied with both 35.22, supra, and 12.31(b), supra. We perceive no reversible error.

■ Appellant, in his last ground of error, contends that the trial court erred in allowing a psychologist to testify that there was a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society because no predicate was laid for such a statement.

The record reflects that, upon a motion by appellant's counsel, the trial court appointed Dr. Howard Patterson to administer a complete psychiatric examination to appellant. At the punishment stage of the trial, testimony was introduced detailing Dr. Patterson's many years of training and experience as a registered psychologist. Dr. Patterson related that he administered five different internationally prescribed psychological tests to appellant, from which

he concluded that appellant was a sociopath. Dr. Patterson stated that the tests revealed that appellant was hostile toward persons and there was a probability that appellant's conduct would repeat itself. Dr. Patterson then testified that, based on his psychological findings, there was a probability that appellant would engage in acts of violence that would cause a continuing threat to society. Appellant objected to this last statement on grounds that there was no predicate in the evidence to justify same.

The record reflects that, in addition to the testimony of Dr. Patterson, a number of witnesses testified that appellant's reputation for being a peaceful and law-abiding citizen was bad. Two other witnesses testified relative to overhearing appellant say, "I won't leave any witnesses," in talking to another person about a robbery. One of these witnesses, Sandra K. Williams, testified that appellant had threatened to kill her of he "saw me on the north side."

Appellant argues that in light of the fact that only one hour was spent administering the tests, "the methods used," and other evidence adduced from the doctor, his opinion was speculation and constituted an invasion of the province of the jury.

To authorize the use of Dr. Patterson's testimony, it was necessary that the trial judge determine from common knowledge or proof that the behavior patterns of a sociopath are so related to some science or profession as to be beyond the knowledge of the average layman; and that Dr. Patterson had such skill, knowledge or experience in the field of psychology that it was probable his opinion would be of assistance to the jury in making a factual determination of whether there was a probability that appellant would commit criminal acts of violence and be a continuing threat to society in the future. *Bueno v. State*, Tex.Cr.App., 501 S.W.2d 339, and authorities there cited. The judge, on the basis of common knowledge, impliedly found that the behavior patterns of a sociopath were beyond the knowledge of laymen and that the witness' knowledge and experience in this field

would assist the jury. The evidence was properly admitted. See *Moore v. State*, Tex.Cr.App., 542 S.W.2d 664; *Livingston v. State*, Tex.Cr.App., 542 S.W.2d 655; *Gholson v. State*, Tex.Cr.App., 542 S.W.2d 395.

Finding no reversible error, the judgment is affirmed.

Opinion approved by the Court.

ROBERTS and PHILLIPS, JJ., concur in the result.