Billy George HUGHES, Jr., Appellant,

v.

The STATE of Texas, Appellee,

No. 57394.

Court of Criminal Appeals of Texas, En Banc.

March 15, 1978.

**582**

Robert A. Scardino, Jr., Houston, for appellant.

Oliver S. Kitzman, Dist. Atty., Hempstead, for the State.

OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. Trial was in Matagorda County upon a change of venue from Austin County. After a verdict was returned finding appellant guilty of capital murder, the jury returned "Yes" answers to the questions required by Art. 37.071(b)(1 & 2), V.A.C.C.P., mandating a penalty of death.

The record reveals that on April 4, 1976, the appellant was stopped by Texas Highway Patrolmen Mark Frederick and Jack Leroy Reichert after they received a radio report that appellant had used a stolen credit card. As Frederick approached the driver's side of the car, the appellant fired a single shot from a 9 millimeter pistol at him. Frederick died as a result of the wound. As appellant's car departed, Reichert fired six shots into the rear of it. The appellant was not wounded, but one of the car's tires was hit. Appellant abandoned the car a short distance away and was arrested after a three-day manhunt.

Appellant entered a plea of "not guilty by reason of insanity." Appellant presented the testimony of Dr. Joseph F. Pentony, a clinical psychologist. Dr. Pentony stated he found appellant to be a "paranoid schizophrenic," and that it was "possible" that appellant could not conform his activities to the requirements of the law. In rebuttal, the State presented the testimony of Dr. John D. Nottingham, Jr., who stated the appellant was "sane" at the time of the offense. Dr. Nottingham further testified that a person can "be accurately diagnosed as a paranoid schizophrenic and still be able to recognize what conduct is wrong and be able to conform his conduct to the requirements of the law." By a special verdict, the jury found the appellant to be "sane" before finding him guilty.

Appellant first complains of the court's action in excusing juror Travis Har-

rison for cause. During voir dire by the prosecution, Harrison testified as follows:

"MR. KITZMAN: Well, I—the law says that prospective jurors and jurors should be informed that a sentence of life imprisonment or death is mandatory upon the conviction of a capital felony. That says a prospective juror will be disqualified from serving on such jury, unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact, and that's why I'm pestering you so much.

"MR. HARRISON: Yeah. There's lots of difference between death and life as far as I'm concerned.

"MR. KITZMAN: Are you telling me then you could not deliberate on these questions of fact without being influenced by your knowledge of that penalty; is that what you're saying?

"MR. HARRISON: Well, I'm afraid that's what I'm saying."

Defense counsel then gave Harrison an explanation of the reasons for the procedure, after which the following took place:

"MR. SCARDINO [defense counsel]: . . Now, knowing all that, the background and the history of it, do you still say that you would be unable to answer those questions without considering the effect of your answers; would you be able to answer the question based on the facts in evidence.

"MR. HARRISON: Of course, when I answered the question, I'd know the reason, what the judgment would probably be, because what he started out saying was could I visualize any kind of case where I could have possibly answered both of those questions in the affirmative. And I told him at the beginning that I could probably, well, I could, in the most extreme, vicious type of murder, but whether it would influence my, both of my answers, I think I would know what the judgment, or be reasonably sure what the judgment would be, and so I think that every juror would know probably what the judgment would be, and to

sit here and tell you that answering those questions and forgetting about what the judgment is going to be, I don't think I'd be honest in saying that. *So, this is getting back to his final question, would I be influenced by what the judgment is going to be, the forethought of it. I'd have to tell you that I would be.*

"Now, like I said, I could answer both questions in the affirmative in the most extreme cases, but I couldn't answer him without being influenced by what I think the judgment would be." [Emphasis supplied.]

V.T.C.A. Penal Code, Sec. 12.31(b), provides:

"(b) Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

Appellant contends that since Harrison testified that he could assess the death penalty "in the most extreme, vicious type of murder," that his exclusion violates the standards of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.

This Court has held that when a juror is disqualified under Sec. 12.31(b), supra, we do not need to consider his qualifications under *Witherspoon. Moore v. State*, 542 S.W.2d 664, *cert. denied*, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977); *Hovila v. State*, 562 S.W.2d 243 (No. 56,989, 2–8–78). Harrison's testimony clearly reveals that his deliberation on issues of fact would be affected by the possibility of the death penalty. No error is shown in the exclusion of Harrison.

■ Appellant contends, "The trial court erred in failing to properly apply the standards of *Witherspoon v. Illinois,* in the voir dire examination of venireperson Mrs. John E. Fitzmorris." During voir dire by the prosecution, the record shows:

"MR. KITZMAN: . . . Let me ask you if you have any conscientious or religious scruples against the infliction of the death penalty as punishment for crime?

"MRS. FITZMORRIS: I'm afraid I do. I just can't.

"MR. KITZMAN: As I've told you before, however you feel about that is the right answer and I'm not here to persuade you that you ought to feel any differently than you do, however you do.

"Do you feel that you've done something about your feeling about that?

"MRS. FITZMORRIS: Well, I feel that people who do these things are ill, really, and I feel that you should make it possible somehow to have a place for them. I think that other people should be protected from them, and it seems to me if we can send a man to the moon, we could do that.

"MR. KITZMAN: Well, unfortunately, we are not doing it, are we?

"MRS. FITZMORRIS: No.

"MR. KITZMAN: You said you think they are ill. Does that mean that you're telling me that you think that anybody who commits a horrible murder has got to be insane in order to do it?

"MRS. FITZMORRIS: I really feel that way.

"MR. KITZMAN: I'm going back to the death penalty matter.

"Can you conceive of a circumstance so bad, so horrible, that if you were sitting on the jury and had the responsibility, that you would purposely vote for a death penalty, in the case where the law provided for it and the facts warranted it?

"MRS. FITZMORRIS: I don't think so, no.

"MR. KITZMAN: Are you telling me that you just could not do that?

"MRS. FITZMORRIS: No, couldn't do it.

"MR. KITZMAN: We challenge for cause, Your Honor."

During voir dire by counsel for appellant that followed, the record reflects:

"MR. SCARDINO: Do you think a person could be mean enough to kill?

"MRS. FITZMORRIS: Well, yes. They can.

"MR. SCARDINO: Do you think a mean person is crazy?

"MRS. FITZMORRIS: Yes.

"MR. SCARDINO: That all mean people are crazy?

"MRS. FITZMORRIS: I think they are. They're sick.

"MR. SCARDINO: Just because they are mean?

"MRS. FITZMORRIS: Yes.

"MR. SCARDINO: Can you envision a crime that is so horrid, that is so bad, for a person to plan terrible plots, gets the tools to carry it out, the guns, the ropes or the knives, carry it out and carries out a scheme, takes somebody's money or kidnaps someone's baby or robs somebody or burglarizes their house; while doing so, kills in order to achieve his end. He has no remorse for what he did but he's caught and brought to trial.

"Do you think a person like that could ever consider the death penalty. Not that—give it. But would you consider the death penalty for a person like that?

"MRS. FITZMORRIS: I don't know, I don't think so. I just don't know.

"MR. SCARDINO: You're just not sure what you would do?

"MRS. FITZMORRIS: No.

"MR. SCARDINO: Then you cannot state that you would automatically vote against the death penalty in every case?

"MRS. FITZMORRIS: No, I can't.

"MR. SCARDINO: You would not vote against it in every case?

"MRS. FITZMORRIS: I don't know. I just don't know.

"MR. SCARDINO: You don't know if you would automatically vote against it?

"MRS. FITZMORRIS: No, I—I just can't; I can't say.

"MR. SCARDINO: It's a hard question.

"MRS. FITZMORRIS: Yes.

"MR. SCARDINO: Not everybody likes to answer that question, and we understand your difficulty in deciding and I appreciate your listening to our questions.

"We pass the juror back, Your Honor.

"THE COURT: Juror excused on the challenge.

"MR. SCARDINO: Note our exception to the Court's ruling."

Appellant argues that under *Witherspoon,* unless a venireman "states unambiguously that he would vote against the imposition of capital punishment no matter what the trial might reveal," a venireman is not subject to challenge for cause. The recent Supreme Court case of *Davis v. Georgia,* 429 U.S. 122, 50 L.Ed.2d 339, 97 S.Ct. 399, is urged by appellant in light of the holding therein that the exclusion of a single venireman in violation of *Witherspoon* constitutes a denial of due process and a death penalty imposed in such a case cannot stand. In its opinion, the Supreme Court did not set forth the voir dire examination of the juror improperly excused, but the same is found in the Georgia Supreme Court's opinion in *Davis v. State,* 236 Ga. 804, 225 S.E.2d 241. The improperly excused venireman, in response to a question propounded to the panel, "Are any of you conscientiously opposed to capital punishment?" answered "I am." The question was then asked, "You are?" and the response was, "Yes." This constituted the sole basis upon which the prospective juror was disqualified in *Davis.* The instant case is in sharp contrast to *Davis* since Mrs. Fitzmorris had stated, "No, couldn't do it," in response to questions about her ability to vote for the death penalty regardless of how horrible and bad the circumstances of the case were. She also answered in the affirmative to a question about "conscientious or religious scruples against the infliction of the death penalty" and followed this answer with the volunteered statement, "I just can't," which could only be taken to mean that she could not vote for the death penalty. While she was certain that she could not vote for infliction of the death penalty however horrible the case might be under examination by the prosecutor, she stated under examination by appellant's attorney that she couldn't say that she would automatically vote against the death penalty in every case.

In *White v. State,* Tex.Cr., 543 S.W.2d 104, prospective juror Barbour, in answer to a question as to whether she could vote for infliction of the death penalty in a proper case, answered:

(1) "I am not sure. I think I believe in it [death penalty], but I am not sure that I could carry it out."

(2) "I think so."

(3) "I just really don't know."

(4) "I don't think so."

In *White,* we concluded:

"In the light of the 'cold' record before us, it would be difficult to say whether venireman Barbour unequivocally stated that she would automatically vote against imposition of the death penalty; however, when she was faced with the question of whether she could take an active part as a juror in the consideration and assessment of the death penalty in a given case, she responded that she did not 'think so.' Her answer was tantamount to a declaration that her personal qualms about the imposition of the death penalty would prevent her from being an impartial juror in a case in which the range of punishment included the death penalty."

In *White, Tezeno v. State,* Tex.Cr., 484 S.W.2d 374, was quoted with approval regarding its treatment of the troublesome area of the "equivocating venireman." In *Tezeno,* it was stated:

"We cannot believe that *Witherspoon v. Illinois,* supra requires certain formal answers and none other. We surely feel that the test of *Witherspoon* is 'not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality."

We must be mindful that where we only have a cold record before us the trial judge in passing on the answers of the "equivocating venireman" has the opportunity to observe the tone of voice and demeanor of the prospective juror in determining the precise meaning intended. *Tezeno v. State,* supra. While her examination was concluded by the answer, "I can't say," and "I just don't know," in response to questions about auto-

matically voting against the death penalty, her earlier answer to questions left no doubt that she could not vote to inflict the death penalty however horrible the circumstances of the case might be.

As was the case in *White,* it would be difficult to say whether Mrs. Fitzmorris unequivocally stated that she would automatically vote against imposition of the death penalty. We find, however, that we need not reach the question of whether the prospective juror was disqualified under *Witherspoon.* Our review of the answers given by the venireman to questions asked as well as information volunteered by her reflects that the court did not err in sustaining the State's challenge for cause. Under questioning by both the State and appellant, Mrs. Fitzmorris persisted in stating that she felt people mean enough to kill and commit crimes were "crazy," "sick," "ill," and "insane." She volunteered that in a time when we can send a man to the moon there should be a place for these people. In light of the fact that appellant's defense was insanity, we find no abuse of discretion in the court concluding that the venireman would not be an impartial juror and sustaining the challenge for cause. See Art. 35.16(a)(9), V.A.C.C.P.

■ Appellant next complains of two instances of improper jury argument by the prosecutor. The first complained of argument is claimed by appellant to have injected an extraneous offense. The record reflects the following argument by the prosecutor at the guilt stage of the trial:

"Ladies and Gentlemen, with the evidence before you, with this arsenal, with this map, with this other thing, I think you can assume that that car had been used before April the 4th in another piece of bad business."

The car which appellant was driving when he shot Frederick was found shortly after being abandoned by the appellant. A search of the car revealed the following items: (1) a .30 caliber M–1 carbine rifle; (2) a twelve-gauge sawed-off shotgun; (3) a .300 or .303 caliber rifle with a case; (4) a shoulder holster; (5) an "ordinary holster"; and (6) a rubber mask. In addition, when appellant was arrested he had in his possession a 9 millimeter Browning automatic pistol. Expert testimony was presented that this was the gun from which the fatal shot was fired.

An examination of the automobile revealed that it contained six gunshot holes and that a tire had also been punctured, apparently by a seventh bullet. Officer Reichert testified that he fired six shots at the car and that the deceased did not fire any shots. An examination of the deceased's service revolver revealed that it contained three live rounds and three spent shell casings. The investigation also revealed that the pistol was not in working order when it was taken from the deceased. The State presented expert testimony that a slug recovered from the car definitely did not come from Reichert's pistol. The expert further testified that after having Frederick's pistol repaired he obtained a sample firing from it. He said the slug from the car was similar to one fired from Frederick's pistol, but that it was too mutilated to make a positive comparison. Finally, testimony revealed that one of the bullet holes in the trunk appeared to have a little rust around it.

In an attempt to explain the seventh bullet hole, the appellant's counsel made the following argument:

"But this—the dead police officer had three rounds missing. I don't think you can believe anything other than the fact that when he went on duty that night that he was a good police officer and that he got dressed and he put that Colt .357 in his holster and that it was loaded and it had six rounds in it when he went on duty that night."

The complained of argument was made in response to the foregoing argument. The argument by the prosecutor was as follows:

"Now, then, the extra bullet.

"There was some comment about this.

" * * * We wanted to show you that there were several bullets in that car and we wanted to show you that there was a

strange bullet in that car, a bullet that did not come from any gun—any weapon in this vicinity.

"Now, our man didn't quite do it for us. He said he couldn't say that it didn't come from the Colt [Frederick's weapon], but he could not say that it did.

"But if you have Officer Reichert's testimony saying it did not, which you have got to believe—nobody is going to disbelieve that young man—the tragedy he has been through—we know there is a seventh bullet on that car.

"Green [an officer who examined the car] testified further that he thought there was a little rust around the hole.

"Ladies and Gentlemen, with the evidence before you, with this arsenal, with this map, with this other thing, I think you can assume that that car had been used before April the 4th in another piece of bad business.

"MR. SCARDINO: Your Honor, we will object to that.

"THE COURT: All right, sir. Overrule it."

In *Alejandro v. State,* Tex.Cr., 493 S.W.2d 230, this Court said:

"To receive the stamp of approval of this court, jury arguments need to be within the areas of: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement." [citations omitted]

The argument in question here is proper both as an answer to argument of opposing counsel and as a reasonable deduction from the evidence. The appellant had argued that the seventh bullet hole came from the deceased's gun, and the State was attempting to demonstrate that it had to have come from some other source. Taking all of the evidence cited by the State into consideration, it is reasonable to assume that the seventh bullet hole might have come as the result of "bad business." Surely any time a gun is fired at a car, it can be characterized as a "bad piece of business." No error is shown.

■ The second complained of argument occurred during the penalty stage of the trial. The record reflects the following argument by counsel for the State:

"Ladies and Gentlemen, let me put it this way and I will do this as humbly as I can.

"I know this, that out of the thirteen of us I am the more expert at assessing punishment for crimes and for assessing penalties—

"MR. SCARDINO: Judge, we have given the prosecutor a lot of latitude, but we are going to object to that.

"MR. SALYER: I will withdraw it, Your Honor.

"But I will just say this:—

"THE COURT: He withdrew it.

"MR. SALYER: . . . as the people's attorney:—

"THE COURT: You are instructed not to consider it since he withdrew it.

"MR. SCARDINO: And we will further ask for a mistrial.

"THE COURT: I will overrule your mistrial motion."

The argument was clearly improper; however, the court's prompt instruction to disregard rendered the error harmless. See *Hicks v. State,* Tex.Cr., 545 S.W.2d 805; *Easley v. State,* Tex.Cr., 454 S.W.2d 758; *Wood v. State,* Tex.Cr., 440 S.W.2d 640; *Morris v. State,* Tex.Cr.App., 432 S.W.2d 920.

■ Appellant next complains of the admission of two photographs into evidence. One of the photographs shows the guns which were recovered from the appellant's car, and the other shows the mask which was also in the car. The appellant complains that both photographs tend to show extraneous offenses.

The record reveals the following testimony from Sheriff T. A. Maddox of Austin County, prior to the introduction of the photograph of the guns:

"Q. Do you recall what weapons, if any, were found in the trunk?

"A. Yes, sir. There was a sawed-off shotgun and a high-powered rifle."

588 ■ 

The appellant's counsel made the following objection when the photograph of the guns was offered:

"As to State's Exhibit No. 19, it serves no purpose in this cause except to bolster the testimony of Sheriff Maddox. *He has testified that there was a rifle found in the trunk of the Defendant's automobile* —or, purported automobile of the Defendant, and that the photograph of a rifle that is purported to be the same one he found does nothing but bolster the testimony and serves no other purpose. . . . " [Emphasis added.]

Both the record and appellant's objection reveal that testimony about the guns found in the car had already been received *without objection.*

In *Alford v. State,* Tex.Cr., 505 S.W.2d 813, this Court said:

" . . . a photograph, proved to be a true representation of the person, place or thing which it purports to represent, is competent evidence of those things of which it is material and relevant for a witness to give a verbal description."

See also: *Terry v. State,* Tex.Cr., 491 S.W.2d 161, and *Martin v. State,* Tex.Cr., 475 S.W.2d 265.

Sheriff Maddox gave a verbal description of the guns without objection and further testified that the photograph did "accurately depict the conditions as they were. . . ." The guns in appellant's vehicle were a circumstance surrounding the offense and a photograph of them was admissible. See *Burns v. State,* Tex.Cr., 556 S.W.2d 270; *Calverley v. State,* Tex.Cr. 511 S.W.2d 60.

With respect to the photograph of the mask, the only identification in the record comes when Sheriff Maddox identified the photograph. At the time the photograph was introduced, the appellant made the following objection:

" . . . I would like to state to the court that in State's Exhibit No. 17, which is a photograph—an eight-by-ten color photograph of what appears to be an extremely grotesque Hallowe'en mask, I submit to the court that the admission of State's Exhibit No. 17 into evidence

serves no purpose in the cause; is irrelevant and immaterial."

On appeal, appellant is urging that "the trial court erred in holding that a photograph of a mask tending to show extraneous offenses was admissible."

In *Burns v. State,* Tex.Cr., 556 S.W.2d 270, this Court upheld the admissibility of a baggie of marihuana which was found near the body of the deceased but not linked to the defendant. The decision was based on "the rule which provides that all of the facts and circumstances surrounding the commission of an offense are admissible." See also: *Calverley v. State,* Tex.Cr., 511 S.W.2d 60; *Lassere v. State,* Tex.Cr., 458 S.W.2d 81. In the instant case, the mask was found in the car from which the fatal shot was fired. Appellant abandoned the vehicle a short time later. We hold that the presence of the mask in the car was "a circumstance surrounding the commission of the offense" and was properly admissible. No error is shown.

 In appellant's final ground of error, it is contended "the trial court erred in holding evidence of a former conviction offered at the commencement of the State's case-in-chief to show motive admissible."

The record reflects that the first witness called by the State was Jene W. Owens, an FBI agent from Mobile, Alabama. Owens testified that the appellant had been convicted on September 26, 1975, in the U. S. District Court for the Southern District of Alabama for "threats to extort and bomb several banks in Mobile," and that appellant had been assessed a three-year probated sentence. After the appellant objected, the trial court ruled the evidence admissible to prove "motive." The court then admonished the jury that the evidence "is limited for your consideration for the purpose of establishing motive, if any, and for no other purpose." A copy of the judgment was admitted into evidence.

The police bulletin which resulted in Frederick's and Reichert's attempt to stop appellant's vehicle was the result of a transaction at the Days Inn near Brookshire. Jo

Ann Johnson, the general manager of the motel at the time of the fatal shooting, identified appellant as the person who had registered at the motel in the name of Harold B. Martin on that date. Appellant told her that he wanted to pay the bill with a Bank Americard bearing that name. Johnson later called Bank Americard for an authorization number and was told that the credit card had been reported stolen and to try to get it away from the party and return it to their office. Johnson went to appellant's room, knocked on the door, and told appellant that she needed his credit card to "restamp it" because she had "stamped it wrong." Appellant responded that he was going to eat at the restaurant and that he would bring it to her. According to Johnson, appellant had already eaten in the restaurant and asked that the charge for the meal be placed on his account. She told appellant that the restaurant was closed and she would take the card and save him a trip. Appellant answered, "I will take it up myself." Johnson then contacted hotel security guard Bennett Cook to get the card from appellant. Johnson then saw appellant "driving out of the driveway real fast. . . ." Johnson gave Cook the information regarding appellant and Cook contacted the authorities by radio.

In *Ellisor v. State,* 162 Tex.Cr. 117, 282 S.W.2d 393, under a similar set of facts, it was stated:

"A number of bills were reserved to the action of the court in permitting witnesses to testify and allowing a portion of the confession to be introduced, both of which showed that some two days before the homicide the appellant had burglarized a tourist court and had stolen the guns which he used to kill Officer Crosby and the money which was found on his person at the time he was apprehended. The fruits of the burglary were in the possession of the appellant at the time Officer Crosby gave chase; the appellant knew that they were stolen and that if Officer Crosby was successful in arresting him and found them he would probably be held accountable for their theft. We think that the evidence relating to the burglary was admissible on the issue of the appellant's intent at the time he shot Crosby.

\* \* \* \* \* \*

"Without the proof of the presence of stolen property in appellant's automobile and without the proof as to the shooting of Scarborough, the jury would have had no evidence as to the appellant's intent when he shot Crosby. Without such evidence, they might have concluded, as the appellant asked them to, that the shooting of an officer in order to avoid receiving a speeding ticket was the act of an insane man."

In *Cherry v. State,* Tex.Cr. 488 S.W.2d 744, upon appeal from a conviction for murder of a police officer on January 10, 1969, this Court held that for the purpose of showing motive, evidence of defendant's escape from the Georgia State Board of Corrections on May 28, 1968, was admissible. See *Chappell v. State,* Tex.Cr., 519 S.W.2d 453; *Hicks v. State,* Tex.Cr., 389 S.W.2d 950; *Stephens v. State,* 147 Tex.Cr. 510, 182 S.W.2d 707; *Stalcup v. State,* 130 Tex.Cr. 119, 92 S.W.2d 443.

With only seven months having elapsed since appellant had received a three-year probated sentence, his desire to avoid apprehension on the occasion in question was apparent. Not only was he fleeing from a motel where he had expressed a desire to pay for his room and a meal with a credit card in another person's name, but in addition thereto he was in possession of a virtual arsenal of weapons. The introduction of the conviction upon which appellant received the three-year probated sentence was probative evidence of appellant's motive to avoid apprehension on the occasion in question. As in *Ellisor,* the evidence of the probated sentence tended to refute appellant's plea that he was insane at the time of the fatal shooting. We hold that the court did not err in admitting evidence of the probated sentence to show motive for the fatal shooting.

In addition, appellant's father took the stand and testified regarding the convic-

tion. In the course of the direct examination, he testified that appellant had been taken into custody by federal authorities, that he had been present at the trial of his son and that he had received "three years probation." Appellant's introduction of evidence of the three-year probated sentence cures error, if any, in its introduction by the State. See *Allen v. State,* Tex.Cr., 536 S.W.2d 364; *Watson v. State,* Tex.Cr., 532 S.W.2d 619; *Lovel v. State,* Tex.Cr., 538 S.W.2d 630; *Doggett v. State,* Tex.Cr., 530 S.W.2d 552.

The judgment is affirmed.

VOLLERS, J., not participating.

PHILLIPS, Judge, dissenting.

I dissent from the majority's disposition of appellant's ground of error complaining of a violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). For the purposes of this dissent I adopt the reasoning of Part I of Judge Roberts' dissent in *Shippy v. State,* Tex.Cr., 556 S.W.2d 246 at 257.

ROBERTS, J., joins in this dissent.