Randall Dale ADAMS, Appellant,

v.

The STATE of Texas, Appellee.

No. 60037.

Court of Criminal Appeals of Texas,
En Banc.

Jan. 31, 1979.

Rehearing En Banc Denied
March 21, 1979.

Melvyn Carson Bruder, J. Stephen Cooper and George A. Preston, Dallas, for appellant.

Henry Wade, Dist. Atty., W. T. Westmoreland, Jr., Douglas D. Mulder and Winfield Scott, Asst. Dist. Attys., Dallas, for the State.

OPINION

DALLY, Judge.

This is an appeal from a conviction for capital murder. The punishment was assessed at death.

Appellant's brief contains forty grounds of error in which he contends that: (1) the trial court erred in refusing to admit evidence of extraneous criminal offenses committed by the State's chief witness, David Harris, and in restricting appellant's cross-examination of another State witness, Teresa Turko; (2) the prosecutor improperly withheld a statement made to the police by witness Emily Miller; (3) the trial court erroneously refused to permit appellant to ask venire members certain questions during voir dire, and excused some venire members for cause in violation of the rule of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); (4) Art. 37.071, V.A.C.C.P., is unconstitutional; and (5) the evidence is insufficient to support the jury's affirmative answer to the second punishment issue.

Appellant was found guilty of the murder of Dallas police officer Robert Wood, who was fatally shot by the driver of an automobile he had stopped for failing to have on its headlights. The shooting occurred at approximately 12:30 a. m. on November 28, 1976, in the 3400 block of North Hampton Road in Dallas.

The State's principal witness was David Harris, who at the time of the offense and trial was sixteen years of age. Harris testified that he ran away from his home in Vidor on November 26, 1976, after stealing money and a car from the house of a neighbor. He also took with him a .22 caliber pistol and ammunition.

Harris drove to Houston, where he spent the night in a shopping center parking lot. On the morning of November 27, Harris drove to Dallas. In Dallas, Harris picked up appellant, who was hitchhiking. Harris and appellant spent the afternoon and evening of November 27 riding around Dallas in the car Harris had stolen, smoking marihuana and drinking beer. That night they went to a drive-in movie.

Harris and appellant left the movie at approximately midnight. Appellant was driving. As they drove south on the street Harris later identified as Hampton Road toward the motel at which appellant was living, they were stopped by a police patrol car. Harris, fearing that he would be identified, slumped down in the front seat so that he would not be seen. As the officer, Robert Wood, approached the driver's window of the car, appellant reached under the front seat where he knew the pistol was located, removed the pistol, shot the officer several times, and rapidly drove away.

After the shooting, appellant drove to his motel, where he and Harris separated. Harris spent the rest of the night in a parking lot, and then returned to Vidor. Harris spent the next several days with friends, to whom he stated that he had shot a Dallas police officer. Harris testified that he made this claim in an effort to impress his friends. Harris was arrested on December 5, 1976, for the theft of the car and was released to the custody of his parents. He was rearrested on December 20, after the Vidor police learned of the incriminating statements he had made with regard to the Dallas murder. Following this arrest, Harris gave a statement detailing his activities in Dallas and identifying appellant as the person who shot Wood.

Appellant, in his testimony, admitted spending the day of November 27 with Harris. But appellant claimed that he and Harris left the movie at approximately 9:30 p. m. and that they separated at a convenience store next door to his motel. Appellant testified that he returned to his motel room no later than 10:00 p. m. and was asleep there at the time of the murder. Appellant's defensive theory was that Harris had shot Wood and was attempting to shift the blame to him.

Pursuant to a motion in limine filed by the State and granted by the trial court, evidence concerning extraneous offenses committed by Harris was first elicited outside the presence of the jury in order that a determination as to its admissibility could

be made. Through Harris' own testimony and that of other witnesses, it was established that Harris had committed several burglaries and a car theft during 1975. It was also established that Harris had been adjudicated a juvenile delinquent following another burglary in April, 1976, and was on juvenile probation at the time of appellant's trial. The trial court ruled that this testimony was admissible, and it was subsequently introduced before the jury. However, the trial court refused to permit the introduction of testimony concerning a burglary and a robbery committed by Harris on December 4 and 5, after his return to Vidor from Dallas. We shall hereafter refer to these offenses as the "December offenses."

Testimony concerning the December offenses was elicited from five witnesses. Harris admitted participating in both offenses. Lynn Brown and Randy Hayes, two of the friends with whom Harris was staying at that time, also testified that Harris committed these offenses. Jim Sharon Bearden, the County Attorney of Orange County, and James Jenkins, the Assistant County Attorney, testified that offense reports had been filed in their office with respect to these offenses and that a petition to revoke Harris' probation had been prepared but not filed. Bearden and Jenkins also stated that no decision had been made whether to prosecute Harris as an adult for the offenses. Appellant contends that this testimony was admissible to establish Harris' bias and motive for testifying against appellant.

■ In general, unadjudicated criminal offenses may not be used to impeach a witness in a criminal case. Art. 38.29, V.A. C.C.P. However, evidence of pending charges against a witness is admissible under certain circumstances for the limited purpose of showing bias, prejudice, interest, and motive of the witness in testifying as he did. *Randle v. State*, 565 S.W.2d 927 (Tex.Cr.App.1978); *Castro v. State*, 562 S.W.2d 252 (Tex.Cr.App.1978); *Evans v. State*, 519 S.W.2d 868 (Tex.Cr.App.1975); *Kissinger v. State*, 126 Tex.Cr.R. 182, 70 S.W.2d 740 (1934). See also *Simmons v.*

*State*, 548 S.W.2d 386 (Tex.Cr.App.1977). Appellant argues that the failure of the Orange County authorities to take any action against Harris based on the December offenses affords the basis for an inference that a bargain had been made with Harris in exchange for his testimony. See *Burkhalter v. State*, 493 S.W.2d 214 (Tex.Cr.App. 1973).

■ An examination of the record reveals that appellant failed to preserve error with respect to the testimony of Bearden and Jenkins. After questioning both witnesses outside the presence of the jury, as required by the motion in limine, appellant failed to secure a ruling by the trial court on the admissibility of their testimony regarding the December offenses. Appellant may not complain on appeal of the exclusion of testimony in the absence of an offer of the testimony and a ruling by the trial court excluding it from evidence. *Norman v. State*, 523 S.W.2d 669 (Tex.Cr.App.1975); *Duran v. State*, 505 S.W.2d 863 (Tex.Cr. App.1974).

■ Appellant did obtain rulings from the trial court excluding from evidence the testimony of Harris, Brown, and Hayes concerning the December offenses. However, in arguing for the admission of their testimony, appellant's trial counsel did not raise the contention now made on appeal. The contention made before the trial court was that the evidence concerning the December offenses showed that Harris was on a criminal spree during the time period in question, and that Harris had a propensity to blame others for his own criminal conduct. The following excerpt illustrates the argument made by appellant's counsel:

"THE COURT: Mr. White, I would like to know now, not talking about his criminal activities prior to the shooting of the police officer, I would like to know how the later commission of a burglary and a robbery by [Harris] is material to this case?

"MR. WHITE: Your Honor, I believe that our defense being that this witness —well, by his own witness is an accomplice but—that it will—that he is the

perpetrator of the crime and I believe that the evidence will show he was on a criminal spree and he was committing one crime after the other.

"THE COURT: In other words, you want to show he is a criminal generally, is that right, is that it?

"MR. WHITE: Not just a criminal generally, but it's the specific time span from November 26th to December 19th that he was on a criminal spree committing a series of related crimes.

\* \* \* \* \* \*

"MR. WHITE: I believe that I have elicited from this [witness] that in relation to the burglary that he was the one that went into the residence, to the trailer and yet upon his arrest he implicated Frank Nelson, Hootie Nelson and Lynn Brown who were not people that went into the residence.

"That in the commission of the robbery he held the rifle, went inside the convenience store, committed the robbery and yet upon his being arrested and giving a statement he implicated two other participants that were not directly—

"THE COURT: It's—

"MR. WHITE: He has a propensity of committing crimes and blaming it on the closest person at hand."

Not only did appellant fail to urge the admission of the December offenses on the ground now urged before this Court, he made no effort to pursue the question of Harris' bias and motive during the trial. The fact that Harris was on juvenile probation was in evidence. It was also established that by stealing his neighbor's money and car and leaving Orange County Harris had violated the terms of his probation. It was also apparent from Harris' description of the events of December 27 and 28 that he was a prime suspect in Wood's murder. Despite the presence of this evidence, appellant did not cross-examine Harris with regard to the existence of any agreement he may have had with the State, nor was Har-

ris asked any questions regarding his motive for testifying against appellant. Appellant did not call County Attorney Bearden to testify before the jury, and in his questioning of Assistant County Attorney Jenkins, appellant made no inquiry into the existence of any understanding between his office and either appellant or the Dallas District Attorney.[1] We hold that the refusal of the trial court to admit testimony concerning the December offenses was not an abuse of discretion in light of appellant's failure to inform the trial court that the testimony was sought to show bias or motive, and the absence of any attempt by appellant to show that Harris' testimony had been prompted by the promise or hope of favorable treatment. *Cloud v. State,* 567 S.W.2d 801 (Tex.Cr.App.1978); *Garza v. State,* 532 S.W.2d 624 (Tex.Cr.App.1976); *Luna v. Beto,* 395 F.2d 35 (5th Cir. 1968).

Officer Teresa Turko was Wood's partner. Turko testified that she was standing near the right rear corner of the assailant's car at the time Wood was shot and that she saw only one person in the car. Turko could not identify this person since she saw only the back of his head, but she did testify that appellant's hair was the same color and worn in the same style as that of the man in the car. Turko also testified that Harris' hair was not similar in either color or style to that of the man she saw.

Outside the presence of the jury, Turko testified that an internal affairs investigation of her conduct on the night of the shooting was conducted by the Dallas Police Department after questions were raised as to the truthfulness of her original report. Although she was not formally suspended, Turko was relieved of her duties for ten days while this investigation took place. As a result of the investigation, the charges against Turko were determined to be unfounded.

The trial court initially granted the State's motion in limine prohibiting appel-

---

1. Harris, Bearden, and Jenkins each testified, in response to questions by the prosecuting attorney outside the presence of the jury, that no

promises or agreements had been made by the State in exchange for Harris' testimony.

lant from introducing evidence of the investigation of Turko's conduct. Appellant contends that the trial court erred by restricting his cross-examination of Turko in this manner. However, during appellant's cross-examination of Turko, the following exchange took place relative to the report Turko had filed pursuant to the investigation:

"Q. Did you make a further statement in connection with the Police Department investigation of the killing of Robert Wood?

"A. Yes, sir, I did.

"Q. Was that statement made by you on the 9th day of December, 1976?

"A. Yes, sir.

"Q. Did you state at the beginning of that affidavit that 'I will also cover the additional allegations that have been surfaced since the shooting incident'?

"A. Yes, sir.

"THE COURT: Let me see you around the side of the bench, Mr. White, Mr. Mulder.

\* \* \* \* \* \*

"MR. MULDER: He can put the whole thing in as far as I'm concerned. I don't want to argue about it any more. He can put the whole thing in.

"MR. WHITE: I'm in agreement that parts of this are appropriate and parts are not. I would like to examine which parts are appropriate.

"THE COURT: Go ahead with your questions.

"MR. WHITE: I would like to take a few moments and—

"MR. MULDER: Judge, I don't have any objection to it and don't have any motion. As far as I'm concerned he can put the whole thing in.

"THE COURT: Are you offering the whole thing?

"MR. WHITE: No, I'm not, I'm not, Your Honor. I'm trying to abide by the terms of previous motions.

"THE COURT: What is it you want to do now, Mr. White?

"MR. WHITE: I'm trying to get Mr. Mulder to identify parts that comply with his motion. I'm going to introduce those parts only.

"THE COURT: Well—

"MR. MULDER: I'm withdrawing any motions, you can put anything you want to put in.

"THE COURT: He said he is—

"MR. MULDER: I'm withdrawing that. Put it all in if you want to."

■ Despite the withdrawal of the State's motion in limine, appellant did not question Turko concerning the internal affairs investigation. Although appellant was given the names of the officers who conducted the investigation, he did not call these officers as witnesses. We hold that the failure of appellant to offer evidence concerning the internal affairs investigation after the State withdrew its motion in limine waived any objection he might have had to the initial exclusion of this evidence. *Jackson v. State,* 552 S.W.2d 798 (Tex.Cr. App.1976); *Johnson v. State,* 527 S.W.2d 525 (Tex.Cr.App.1975).

Three witnesses testified that they drove past the scene of the shooting after the assailant's car had been stopped but before Wood was shot. Emily and Robert Miller testified that they saw only one person in the suspect car and identified appellant as that person. Michael Randall testified that he saw two people in the suspect car and identified appellant as the driver.

Each of these witnesses gave a written statement to the police soon after the shooting. In Emily Miller's statement, she describes the assailant as "a Mexican or a very light skinned black man." Appellant contends that, since he is neither black nor of Mexican descent, this prior statement was relevant to the issue of Emily Miller's credibility and that the prosecutor improperly withheld the statement in violation of the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Appellant learned of the existence of Emily Miller's statement when, three days after she testified and after appellant had waived her further appearance, appellant's

trial counsel asked the prosecutor to see the written statements of the three identification witnesses. At this point in the trial, both sides had rested and Emily Miller had moved to an unknown address believed to be in Illinois. Given the uncertainty as to whether and when Emily Miller could be located, the trial court refused appellant's request to introduce her statement into evidence.

Prior to trial, appellant filed a motion for the disclosure of evidence favorable to the accused in which he requested, among other things, the statements of witnesses. Appellant contends that the failure of the prosecutor to comply with this motion with respect to Emily Miller's statement denied him due process of law, citing *Crutcher v. State*, 481 S.W.2d 113 (Tex.Cr.App.1972). In *Crutcher*, a burglary conviction was reversed because of the failure of the prosecutor to reveal a police offense report that contained a description of the burglar by the State's chief identification witness. This description was basically inconsistent with the appearance of the defendant. We held that the existence of this inconsistent description was relevant to the witness' credibility and that the prosecutor violated his duty under *Brady v. Maryland*, supra, when he knowingly failed to reveal the existence of the offense report despite an attempt by the trial court, at the hearing to determine the admissibility of the witness' in-court identification, to determine if there were any discrepancy between the witness' description of the burglar and the actual appearance of the defendant.

■ A defendant is entitled to examine the written statement of a witness for purposes of cross-examination upon demand made *after* the witness has testified on direct examination. *Gaskin v. State*, 172 Tex.Cr.R. 7, 353 S.W.2d 467 (1961). The distinction between the general *Brady* rule and the more specific *Gaskin* rule was discussed in *Payne v. State*, 516 S.W.2d 675 (Tex.Cr.App.1974), in which the defendant complained of the prosecutor's failure to disclose the statements of the State's witnesses prior to trial:

"Reliance is primarily made on *Brady v. Maryland*, [supra], which is limited to suppression of exculpatory evidence by the prosecution to an accused upon request as being a violation of due process. Several federal jurisdictions favor pre-trial disclosure of evidence subject to the *Brady* doctrine. [Citations omitted.] Despite the announced policy in these federal jurisdictions, the legislative policy of Texas is to the contrary. Art. 39.14, V.A. C.C.P., specifically excepts written statements of witnesses from pre-trial discovery. We do not feel compelled to expand upon the rule followed in this State since the procedure of disclosing such evidence at trial affords the appellant an opportunity to request a postponement or continuance which adequately satisfies due process requirements of *Brady v. Maryland*, supra."

■ A defendant is entitled to examine the prior statements of a State witness only if he makes a timely and specific request to do so following the witness' direct testimony. *Mendoza v. State*, 552 S.W.2d 444 (Tex.Cr.App.1977); *Zanders v. State*, 480 S.W.2d 708 (Tex.Cr.App.1972); *Gaskin v. State*, supra. Appellant did not request to see Emily Miller's written statement until three days after she had testified. This was not a timely request, and appellant may not complain of the failure of the prosecutor to disclose the statement earlier.

■ Emily Miller was one of three identification witnesses. Her statement describing the suspect as a black or Mexican man was based on having seen the assailant for a few seconds as she and her husband drove past the scene. This is in contrast to *Crutcher v. State*, supra, where the sole identification witness had had a face-to-face conversation with the burglar and had soon thereafter given the police a detailed description which did not fit the defendant. The record also reveals that Emily Miller positively identified appellant in both a lineup and a photographic display. After examining the entire record, we cannot say that Emily Miller's written statement creates a reasonable doubt as to appellant's

guilt. See *Frank v. State,* 558 S.W.2d 12 (Tex.Cr.App.1977); *Smith v. State,* 516 S.W.2d 415 (Tex.Cr.App.1974).

Appellant contends that the trial court erred by restricting his questioning of certain venire members, thereby preventing him from using intelligently his peremptory challenges. The necessity to question freely and broadly on voir dire in order to decide intelligently when to use one's peremptory challenges has been firmly established as a concomitant to the constitutional right to counsel. *Smith v. State,* 513 S.W.2d 823 (Tex.Cr.App.1974); *De La Rosa v. State,* 414 S.W.2d 668 (Tex.Cr.App.1967). Although the decision as to the propriety of any question during voir dire is left to the discretion of the trial court, that discretion is abused when a proper question about a proper area of inquiry is prohibited. *Smith v. State,* supra. There is no doubt, however, that reasonable restrictions on the exercise of voir dire examination may be imposed for various reasons, among them to curb the prolixity of what can become the lengthiest part of a criminal proceeding. *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr. App.1978); *Smith v. State,* supra. In the instant case, jury selection began on March 28, 1977, and did not end until April 25, after the examination of more than one hundred venire members. The transcription of the voir dire examination fills more than 5,700 pages of the record.

Appellant raises three grounds of error regarding his examination of Mrs. Willie Millhollon. The first is based on the following exchange:

"Q. (By Ms. James) All right. Now, you believe there are two sides to every story?

"A. Yes.

"Q. All right. And after the Prosecution has rendered their version, you will, of course, wish to hear the Defendant's version, will you not?

"MR. TOKOLY: Objection.

"THE COURT: Sustained. Don't answer. Ask your next question.

"MS. JAMES: Well, Your Honor, I believe this goes to the burden of proof in the right of—

"THE COURT: It's a leading question."

Appellant contends that the attitude of venire members about the accused's right not to testify is a proper area of inquiry on voir dire.

Although it is apparent that the prosecutor's objection was sustained because of the leading nature of the question, and not because of its subject matter, appellant did not rephrase the question. Furthermore, the proper inquiry is not whether the juror might wish the accused to testify, but whether the juror would, regardless of his wishes, follow the law and not consider the silence of the accused as evidence against him. *Barry v. State,* 165 Tex.Cr.R. 204, 305 S.W.2d 580 (1957). The trial court did not abuse its discretion in sustaining the objection.

While questioning Millhollon, appellant's counsel made the following statement concerning courtroom security:

"Q. And there's another matter, that during the trial—I don't know what measures exactly the Court has to secure, whether there will be searches at the door. There will undoubtedly be a large number of Bailiffs and Deputy Sheriffs entrusted with the security of this courtroom and they will be wearing badges and guns and there will be a large number of Sheriffs and other security people around the Courthouse and possibly individual searches of people coming into the courtroom.

"THE COURT: Wait a minute. Where did you get that from?

"MS. JAMES: Well, I don't know if Your Honor plans to search people or not.

"THE COURT: Then let's don't tell the jurors what I'm going to do about security when you don't know."

The statement was obviously based on speculation, and the trial court did not err in refusing to permit questions based thereon.

Finally, appellant asked Millhollon the following question:

"Q. All right. Do you have any hostile feelings toward persons whose life style differs from your own?

"MR. TOKOLY: Judge, that's so vague.

"THE COURT: Sustained."

Appellant has made no showing as to the relevance of this question, other than to assert that it "attempts to determine whether the venireman was one who is prejudiced against, rather than tolerant of, those different from herself." No abuse of discretion is shown. See *Johnson v. State*, 467 S.W.2d 247 (Tex.Cr.App.1971).

■ Appellant's counsel explained to venire member Leslie Goekler that appellant did not have to testify and that this could not be considered as evidence against him, and Goekler stated that he understood. Goekler was then asked:

". . . We have gone through the presentation of the evidence by the Prosecution; and at that point would you expect the Defendant to testify?

"A. No.

"Q. Well, being honest with yourself, wouldn't you want him to explain—

"MR. TOKOLY: Objection.

"THE COURT: Sustained. Don't suggest.

"Q. (By Ms. James) Do you think he should testify? Do you think he should—

"MR. TOKOLY: Judge, pardon me. I object to this whole line of questioning because—

"THE COURT: Sustained."

Since appellant had already established that Goekler understood that appellant did not have to testify and that he would not expect him to testify, the trial court did not abuse its discretion in sustaining the objections to the subsequent, essentially duplicitous questions. *Bodde v. State*, supra; *Smith v. State*, supra; *Barry v. State*, supra.

■ During the voir dire examination of Raymond Wagner, it was established that he had read news stories about the shooting of Officer Wood, but that he remembered few of the details and retained no impression of the stories. Appellant subsequently asked Wagner:

"Q. Would you say that the news stories that you have read were slanted towards the side of the prosecution in this case?

"MR. SCOTT: Objection, Your Honor.

"THE COURT: Sustained.

"Q. (By Ms. James) All right. Were you changed in any of your thinking by any of the newspaper stories that you read?

"A. Well, I haven't really given it any thought.

"Q. All right. It was not a matter of any importance to you at that time?

"A. No, ma'am.

"Q. All right. Did you have an occasion to read in the newspaper any opinion of any prominent person about this case?

"A. No, ma'am."

Appellant contends that the question objected to was an "attempt to elicit the venireman's perception of the articles he previously admitted he had read and remembered." Wagner was thoroughly questioned concerning his memory of the news stories he had read, and he stated that he retained no impression of them. The trial court did not abuse its discretion in sustaining the objection. *Bodde v. State*, supra; *Smith v. State*, supra.

■ The following also occurred during appellant's examination of Wagner:

"Q. (By Ms. James) If after the prosecution has rendered their version and they have closed their testimony and you have heard all of their evidence and the case is then in the hands of the defense, would you expect Randall Dale Adams to testify?

"MR. TOKOLY: Objection, because the predicate has not been laid.

THE COURT: I understand. What [we] are talking about predicate is this, the ultimate issue that we are asking about is really can you follow the law as I will give it to you at the end of the trial.

JUROR WAGNER: Right, I will follow the law.

"THE COURT: If the Defendant does not testify during the trial then part of the law I will give you would be that in deliberating upon any issue in the case that you are not to consider his failure to testify as any evidence of anything, period.

"All right. You are not to discuss it, consider it or refer to it in any way during your deliberations. Now, some jurors are of the frame of mind that if the Defendant doesn't testify then they would in some way hold that against the Defendant, if they are of that frame of mind then they could not be a fair juror because they could not follow the instructions of the Court. There are some people who just couldn't follow the instructions on that. They may feel like if the Defendant doesn't testify, 'By golly I'm going to convict him,' for whatever reason.

"So Ms. James is trying to find out if the defense—Defendant does not testify in the trial if on one hand you would hold that against him or if on the other hand you could follow the Court's instruction and not consider his silence as a witness—

"JUROR WAGNER: I could follow the Court's instructions.

"THE COURT: Go ahead, Ms. James.

"Q. (By Ms. James) Well, would you want him to testify?

"MR. TOKOLY: Well, I object to that.

"THE COURT: Sustained.

"Q. (By Ms. James) Well, the Court has just given the predicate for you, you have said you would follow the law in the Court's Charge and I think that the Court would charge you that the Defendant does not have an obligation to testify, but wouldn't you want him to testify?

"MR. TOKOLY: Objection.

"THE COURT: Well, as to whether the juror would want him to testify or not, I'm not going to allow that. Well, no, I beg your pardon. I'm going to sustain the objection. Go on to your next question.

\* \* \* \* \* \*

"Q. (By Ms. James) All right. Being honest with yourself wouldn't you wonder why the Defendant didn't testify?

"MR. TOKOLY: Objection.

"THE COURT: Sustained.

"Q. (By Ms. James) All right. Now, if the Court has followed—has given you the law in the Court's Charge would you wonder why he did not explain himself?

"MR. TOKOLY: Objection.

"THE COURT: Sustained.

"Q. (By Ms. James) All right. Do you think that these thoughts about why he did or didn't testify might be subconsciously affecting your determination of innocence or guilt?

"THE COURT: Do you object to that?

"MR. TOKOLY: Yes.

"THE COURT: I will allow that question provided it be rephrased to not assuming something that is not before the Court.

"Do you feel that any thoughts that you might have about why the Defendant didn't testify or for what reason he didn't testify or any thoughts like that, do you feel that any feelings you might have about it would or could be such that they would prevent you from following my instructions of not considering his silence?

"JUROR WAGNER: No, I would follow the law whatever your Instructions were.

"THE COURT: Any feelings or thoughts you might have about it I take it from what you say would not be such as it would preclude you or prevent you from being able to follow the Court's instructions?

"JUROR WAGNER: That's right.

"THE COURT: Go ahead, Ms. James."

Wagner's ability to follow the law should appellant not testify was thoroughly tested. The trial court did not abuse its discretion in sustaining the objections. *Bodde v. State,* supra; *Smith v. State,* supra; *Barry v. State,* supra.

A similar exchange took place during the examination of Paul Matlock:

"Q. All right. Now, after the Court has charged you on the law of course that will be after the prosecution has rendered their version, would you expect the Defendant to testify?

"MR. TOKOLY: Here again—

"THE COURT: You have to lay a predicate.

"Q. (By Ms. James) Well, I think that—you know that the Defendant does not have the burden of proof, does not have to testify although he can if he wishes. Now, after the prosecution has rendered their version and after the Court has instructed you on the law would you still expect the Defendant to testify?

"A. Not necessarily.

"Q. All right. Would you think he was hiding something if he didn't testify?

"MR. TOKOLY: Objection.

"THE COURT: Sustained.

"Q. (By Ms. James) Well, being honest with yourself, wouldn't you think these thoughts might subconsciously prevent you from following the Court's instructions?

"THE COURT: Don't lead your witness. Rephrase your question.

"Q. (By Ms. James) Do you think that your thoughts might subconsciously affect your determination of innocence or guilt?

"MR. SCOTT: I don't see how a person can answer that.

"THE COURT: Sustain the objection. The question is if the Defendant does not testify you will be instructed by the Court not to consider his silence as any evidence in the case. You are not to discuss it, refer to it or consider it in any way. And the question is if you are on the Jury and that occurs and you are so instructed would you follow that instruction of the Court?

"JUROR MATLOCK: Correct. Yes.

"THE COURT: Go ahead, Ms. James."

Again, no abuse of discretion is shown. *Bodde v. State,* supra; *Smith v. State,* supra; *Barry v. State,* supra.

Venire member Charles Abbott was asked:

"Q. Do you drink?

"A. Occasionally.

"Q. You have no prejudice or otherwise that would cause you to disbelieve anybody who took a drink?

"A. No.

\*      \*      \*      \*      \*      \*

"Q. (By Ms. James) Well, would you have any bias, even though the law permits drinking, against anybody who drinks which would cause you to disbelieve part or all of his testimony?

"MR. TOKOLY: I object to that.

"THE COURT: Sustained . . . ."

The last question was duplicitous; no abuse of discretion is shown. *Bodde v. State,* supra; *Smith v. State,* supra.

The following questions were asked of venire member Leo Cunningham:

"Q. All right. Now, if the Court should instruct you that silence of the Defendant is not evidence, and that he does not have to testify, and if the Court has charged you on the law and after the—this would necessarily be after the Prosecution has rendered its version, would you still expect the Defendant to testify?

"A. I don't think so.

"Q. All right. Would you want him to testify?

"MR. TOKOLY: Now, Judge—

"THE COURT: Sustained.

"MR. TOKOLY: —we object to that."

The second question was essentially a repetition of the first, and we find no abuse of discretion. *Bodde v. State,* supra; *Smith v. State,* supra; *Barry v. State,* supra.

Venire member Lester Hutchings was asked:

"Q. (By Ms. James) Well, if there is evidence of violence in this case or there are descriptions of injuries or wounds leading to death, would that fact alone prejudice you against Randall Dale Adams?

"A. No.

"Q. All right. Would the presence of violence, bloodshed, injury or death shock you or embarrass you so as to interfere with your objectivity?

"A. No, ma'am.

"Q. All right. Would evidence of injuries causing death hamper your consideration of all the other evidence in any way?

"A. I don't think so.

"Q. You're not just going to get grossed out and stampede some way or other?

"A. No, ma'am.

"Q. All right. The Defendant, of course, is entitled to his day in Court; you do agree with that?

"A. Yes, ma'am.

"Q. All right. Would you be upset because this is a case in which someone has died?

"MR. SCOTT: Judge, we object. That—

"THE COURT: Sustained."

The question objected to was duplicitous, and the trial court did not err by sustaining the objection. *Bodde v. State*, supra; *Smith v. State*, supra.

The following exchange took place during appellant's examination of venire member Anita Pritchett:

"Q. All right. Now, if the Court should instruct you that the silence of the person on trial is not evidence and after the Court has charged you on the law and that is a necessity after the prosecution has rendered their version, would you still expect Randall Dale Adams to testify?

"THE COURT: Realizing again, that he has no obligation to testify.

"THE WITNESS: Right. That is his right. If he wants to testify in his behalf, I think that would be—

"MS. JAMES CONTINUING:

"Q. Would you expect him to explain?

"MR. SCOTT: Judge, I think that is an improper question.

"THE COURT: Sustained."

We again find no abuse of discretion. *Bodde v. State*, supra; *Smith v. State*, supra; *Barry v. State*, supra.

It should be noted, with regard to the questioning of the venire members as to their desire or expectation that appellant testify, that appellant did testify at the guilt-innocence phase of the trial. Thus, the harm, if any, caused appellant by the rulings of the trial court complained of above was rendered moot.

■ Appellant contends that thirteen venire members were erroneously excluded for cause under V.T.C.A. Penal Code, Sec. 12.31(b), which provides that a prospective jury member in a capital case shall be disqualified unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact. Specifically, appellant contends that by permitting the application of Sec. 12.31(b), supra, to the three punishment issues specified by Art. 37.071, V.A.C.C.P., the trial court bestowed upon the prosecution a broader basis of exclusion than allowed under the rule of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). However, this Court has consistently held that the statutory scheme for the selection of jurors in capital cases in Texas, and in particular the application of Sec. 12.31(b), supra, to the punishment issues, comports with the constitutional requirements of *Witherspoon*. *Hughes v. State*, 563 S.W.2d 581 (Tex.Cr. App.1978); *Hughes v. State*, 562 S.W.2d 857 (Tex.Cr.App.1978); *Freeman v. State*, 556 S.W.2d 287 (Tex.Cr.App.1977); *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977); *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr. App.1976); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976). The trial court did not err in excluding from the jury those venire members who could not state that their deliberations on the punishment issues would not be affected by the mandatory penalty of death or life imprisonment.

Other than to object to the application of the statute to the punishment issues, appellant does not take issue with the trial court's determination that the thirteen venire members were disqualified under Sec. 12.31(b), supra. We have reviewed the voir

dire examinations of these venire members and conclude that the trial court was correct in its determination.

Appellant contends that Art. 37.071, V.A. C.C.P., is unconstitutional because the punishment issues specified therein, in particular the second issue, "fail to present for the jury's consideration any concept of 'desert,' thus depriving the defendant of the critical consideration of the jury of any defined standard by which they may decide if the defendant 'ought to die,' this being a requirement of the Constitution as interpreted in *Gregg v. Georgia*, [428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)]." In a related argument, appellant contends that Art. 37.071, supra, is unconstitutional because "there are no provisions for jury lenience if all the special issues are answered affirmatively thus calling for jury negation should the jury believe that under all the circumstances the defendant does not 'deserve' a sentence of death."

Appellant acknowledges that the defendant in a capital case in Texas may offer at the punishment hearing any relevant mitigating evidence. *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr.App.1975), affirmed, *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Robinson v. State*, 548 S.W.2d 63 (Tex.Cr.App.1977). See also *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). However, appellant argues that such evidence is of no avail to the defendant if the jury is convinced by the evidence beyond a reasonable doubt that the punishment issues should be answered affirmatively. In such a case, appellant argues, the punishment of death is mandatory even though the jury, on the basis of the mitigating evidence, may believe that death is inappropriate. Appellant contends that this system is of the sort condemned in *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), and *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

In *Gregg*, the Supreme Court recognized retribution as one of the underlying purposes of the death penalty. The Court also made it clear that the sentencing authorities must give attention to the nature and circumstances of the crime and to the character of the defendant in determining whether death is the appropriate punishment in a particular case. From this, appellant asserts that "[i]t may no longer be doubted that there must be a finding that the individual adjudged guilty of a capital crime 'deserves to die' before he can be so sentenced." But the Court clearly did not intend that the sentencing authority be given such broad discretion to decide whether a given defendant ought to receive the death penalty:

> "*Furman* [*v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)] mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion should be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."

*Gregg v. Georgia*, supra, 428 U.S. at 189, 96 S.Ct. at 2932.

The Supreme Court has described the Texas capital sentencing scheme as follows:

> ". . . Texas law essentially requires that one of five aggravating circumstances be found before a defendant can be found guilty of capital murder, and that in considering whether to impose a death sentence the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it . . . [T]he Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death."

*Jurek v. Texas*, supra, 428 U.S. at 273, 274, 96 S.Ct. at 2957. Appellant would substitute for this guided discretion the right of the jury to decide, by its own lights, whether or not the defendant ought to die. The flaw in appellant's argument is best seen when it is turned around: if a defendant may not be given the death penalty, regardless of the jury's answers to the punishment issues, unless the jury believes that he "de-

serves to die," it would follow that if the jury so believes, then the defendant must be sentenced to death regardless of the answers to the punishment issues. Thus, appellant would return to the jury in a capital case the unbridled discretion to impose the death penalty condemned in *Furman v. Georgia*, supra.

*Lockett v. Ohio*, supra, does not support appellant's contentions. In *Lockett*, the Court held that the Ohio capital sentencing scheme was unconstitutional because the sentencing authority was permitted to consider only three specified mitigating circumstances. The Court held that any relevant mitigating evidence offered by the defendant must be considered by the sentencing authority in determining whether the punishment of death should be imposed. Texas practice is in accord with this holding. *Jurek v. State*, supra; *Robinson v. State*, supra. At the same time, the Court re-stated the view of the plurality in *Gregg* that the discretion of the sentencing authority must be "directed and limited" so that the death penalty will be imposed in a consistent manner. *Lockett v. Ohio*, supra, 98 S.Ct. at 2963. The three issues specified in Art. 37.071, supra, provide this direction and limit the discretion of the jury so as to prevent the arbitrary or capricious imposition of the death penalty.

Contrary to appellant's contention, Art. 37.071, supra, is not a mandatory statute of the sort held unconstitutional in *Woodson v. North Carolina*, supra, and *Roberts v. Louisiana*, supra. The statutes struck down in *Woodson* and *Roberts* mandated the death penalty for all defendants convicted of first-degree murder, without consideration of mitigating factors presented by the circumstances of the particular crime or by the attributes of the individual offender. These statutes invited juries to disregard their oaths and the trial judge's instructions and choose either a not guilty verdict or a guilty verdict for a lesser offense whenever they felt that the death penalty was inappropriate. Thus, the North Carolina and Louisiana capital sentencing procedures did not provide standards to channel jury judgments, nor did they permit review to check

the arbitrary exercise of the capital jury's de facto sentencing discretion.

Although the death penalty in Texas is mandatory upon the return of affirmative answers to the three punishment issues, Art. 37.071, supra, the jury does not consider the punishment issues unless it has first found the defendant guilty of murder under certain specified aggravating circumstances. V.T.C.A. Penal Code, Sec. 19.03. Furthermore, in answering the punishment issues the jury must consider all the relevant evidence concerning the particular offense and the individual defendant offered by the State or by the accused. *Jurek v. State*, supra; *Robinson v. State*, supra. The punishment issues give guidance to the jury regarding those factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision. *Gregg v. Georgia*, supra, 428 U.S. at 192, 96 S.Ct. 2909. The punishment issues provide for the guided jury discretion found wanting in pre-*Furman* death penalty statutes and in the statutes in question in *Woodson* and *Roberts*.

■■■ We hold that Art. 37.071, supra, is not unconstitutional for failure to present for the consideration of the jury the concept of "desert." We also hold that Art. 37.071, supra, does not impose the death penalty in an unconstitutionally mandatory manner.

Appellant contends that the phrase "criminal acts of violence" contained in the second punishment issue is a technical legal phrase which must be defined in the jury charge. He further contends that left undefined, the phrase is unconstitutionally vague and calls upon the jury to decide a question beyond its competence. These contentions have been presented to and rejected by both this Court and the United States Supreme Court. *Jurek v. Texas*, supra; *Jurek v. State*, supra; *Blansett v. State*, 556 S.W.2d 322 (Tex.Cr.App.1977); *King v. State*, 553 S.W.2d 105 (Tex.Cr.App. 1977); *Battie v. State*, 551 S.W.2d 401 (Tex. Cr.App.1977).

■ In his final ground of error, appellant contends that the evidence is insufficient to support the jury's affirmative answer to the second punishment issue. The record discloses that appellant's only prior criminal conviction was for driving an automobile while intoxicated. Appellant had also been absent without leave for a short time during his service in the Army. At the punishment hearing, Dr. John Holbrook, a psychiatrist, testified that he had examined appellant and determined that he has the profile and characteristics of a sociopath. Holbrook also testified that he would expect little or no change in this diagnosis in the future and that, in his opinion, appellant would commit criminal acts of violence in the future that would constitute a continuing threat to society. Dr. James Grigson, another psychiatrist, gave similar testimony. This testimony, when considered with the evidence of the crime itself, which was a particularly senseless and motiveless killing, is sufficient to support the jury's determination that appellant would constitute a continuing threat to society. *Ferguson v. State*, 573 S.W.2d 516 (Tex.Cr.App. 1978); *Shippy v. State*, 556 S.W.2d 246 (Tex.Cr.App.1977); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976).

The judgment is affirmed.